COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

                                                                              )

                                                                              )             No.  08-02-00096-CV

                                                                              )

                                                                              )                 Appeal from the

IN THE INTEREST OF E.R.L.,
J.A.L., D.L.L.,    )

and
Z.K.L., Children                                              )             
109th District Court

                                                                              )

                                                                              )        
of Andrews County, Texas

                                                                              )

                                                                              )                 
(TC# 15, 508)

                                                                              )

 

MEMORANDUM   OPINION

 

This is an appeal
from an order terminating the parental rights of Appellant T.F. to her four
children, E.R.L., J.A.L., D.L.L., and Z.K.L. 
On appeal, T.F. challenges the legal and factual sufficiency of the
evidence to support the statutory grounds for the trial court=s judgment.  We affirm.

FACTUAL
BACKGROUND








T.F. is the mother
of four children, three of whom are from her marriage to A.L. in 1993.  Her eldest son E.R.L. was born October 28,
1993; her son J.A.L. was born September 7, 1994; her daughter D.L.L. was born
September 16, 1996; and her son Z.K.L. by a different father was born September
20, 1999.  The Texas Department of
Protective and Regulatory Services (ADepartment@) had its first contact with the family
in 1995, after receiving a referral that the children had been left alone at
home for two hours.  From its
investigation of the incident, the Department determined that there was Areason to believe@ there had been negligent supervision
of E.R.L. age two and J.A.L. age thirteen months.  At the time, T.F. was separated from
A.L.  In November 1995, T.F. moved with
the children to Omaha, Nebraska to live again with A.L.  T.F. and A.L. divorced in Nebraska in
1996.  In February 1996, Nebraska Child
Protective Services (ANebraska
CPS@) removed T.F.=s children from her and they remained
in foster care for approximately a year and a half.  Thereafter, Nebraska CPS placed the children
with their father, who later gave the children to T.F.=s mother in Texas.  In 1998, T.F.=s relatives returned T.F.=s children to her.  In 1999, T.F. had a brief relationship with
S.C., who fathered Z.K.L.  In 2000, T.F.
became involved with S.F., her current husband, who was living with her and the
children and helping T.F. to raise all four children before the Department
removed the children from their home in July 2000.








The Department=s current involvement with the family
began in March 2000, after receiving a referral alleging that J.A.L. had been
physically abused.  In the March
incident, T.F. reportedly spanked J.A.L. with a Acircle
board@ for
wetting the bed.  In its investigation,
the Department found there were skin discolorations on all of the
children.  In April 2000, the Department
received another referral, alleging that D.L.L. had bruises covering most of
her buttocks.  An investigator found that
D.L.L.=s
buttocks were black, fading to blue on the outer edges of the bruises.  Both T.F. and S.F. denied making the bruises
on D.L.L., though after further investigation, T.F. indicated to the Department
that she and S.F. both utilized some physical discipline as far as spanking the
children.  The Department also discovered
that T.F. and S.F. had begun disciplining the children by making them stand against
the wall with their arms outstretched for three hours at a time and would spank
them if their arms dropped.  

As a result of its
March and April investigations and upon discovering the family=s involvement with CPS in Nebraska, the
Department opened a family preservation case in the beginning of June 2000 and
assigned a case worker to work with the T.F. and S.F. on appropriate methods of
discipline and on their parenting skills generally.  On July 7, 2000, the Department received an
emergency report that T.F. had thrown D.L.L. against a window.  Department investigators went to the home and
noticed that three-year-old D.L.L. had dried blood on her nose.  The Department found the boys, E.R.L. age six
and J.A.L. age five, outside pulling weeds as a form of punishment.  The boys said that they had not seen what had
happened because they had been outside pulling weeds since breakfast.  By the time the Department arrived at the home,
it was four o=clock
in the afternoon and over 100 degrees. 
The Department determined that T.F. had slapped D.L.L. in the nose and
then had tried to change the child=s
clothing when blood from D.L.L.=s
nose began to run on her clothing.  In so
doing, T.F. had thrown D.L.L. causing the child=s
left leg and thigh to hit the window, which was about eight inches above her
bed.  That day, T.F. voluntarily placed
the children in the care of S.F.=s sister.  The children remained with S.F.=s
sister for approximately two weeks before the sister indicated to the
Department that she could no longer care for them.








After finding no
suitable placement with relatives, the Department decided to initiate this
action and seek temporary managing conservatorship of
all four children.  At the time, the
Department=s primary
concern was that the pattern of discipline was escalating to the point where
there was a serious risk of injury to the children.  In late July, the trial court appointed the
Department as temporary managing conservator of the children and they were
placed in a foster home where they remained for almost a year.  After initiating this action, the Department
also developed a family service plan with T.F. and S.F. to work towards family
reunification.  The service plan included
participation in psychological evaluations, family and individual counseling,
and parenting classes.  T.F. and S.F.
cooperated with the Department in fulfilling these requirements of their
service plan.

As part of the
reunification plan for the family, the Department began allowing supervised
visits between T.F., S.F., and the children. 
After the first unsupervised visit, the children were observed acting
out sexually in the foster home.  During
this time, the children alleged that they were sexually abused by T.F.  The Department conducted an investigation
into the allegations, but did not reach any conclusive determination and
continued to work towards reunification. 
However, based on the sexual abuse allegations, the Department arranged
for counseling with Terry Valero, a therapist with specialization in sexual
abuse.  In March 2001, Ms. Valero began
seeing the children, T.F., and S.F. for individual and family counseling
sessions.  During the summer of 2001, the
Department decided to make a recommendation to the trial court that some of the
children start to be phased back into the home to see if the Department=s support services to T.F. and S.F.
were sufficient to allow them to provide a safe environment for the
children.  E.R.L., the eldest child at
age seven was not included in the reunification plan because there had been
incidents in which E.R.L. sexually abused his sister D.L.L. and had also
manipulated J.A.L. into trying to perpetrate D.L.L.  The Department decided and the counselor also
recommended that E.R.L. be removed from his siblings and E.R.L. was placed in
High Sky Children Ranch.  








The Department
began phasing T.F.=s
children back into the home on August 13, 2001. 
J.A.L. was the first child to be placed back in T.F.=s 
and S.F.=s
care.  In November, D.L.L. was brought
back into the home and Z.K.L. was returned in December.  While working on reunification, the
Department had explained to T.F. and S.F. that during reunification, the
Department and the court would be monitoring the process closely to see if they
were utilizing appropriate parenting techniques with the children.  During this time period, the Department was
monitoring how the children were doing and the assigned case worker was in
contact with relatives, the children, and their therapist Ms. Valero.  As they were being phased back in, the
children, T.F., and S.F. continued to have therapy sessions with Ms.
Valero.  








During November
and December of the phasing period, Ms. Valero expressed some concern about the
welfare of the children if they were to continue to remain in the home.  The Department also received numerous phone calls
that the excessive discipline was continuing. 
S.F. indicated to the caseworker that he felt T.F.=s discipline was becoming somewhat
excessive and admitted that he had begun spanking the children again.  There were also indications that they were
using Atime-outs@ in a manner the Department considered
excessive.  T.F. told the Department that
they had placed J.A.L. in time-out for a day and a half for receiving a low
grade at school and only allowed him to leave his room in order to use the
restroom or to eat.  The Department
became concerned that T.F. and S.F. had reverted back to physical discipline
and Ms. Valero continued to have numerous concerns as far as T.F.=s
and S.F.=s
parenting ability.  In December 2001, the
Department decided to remove the children from the home and place them back
into foster care.  A big factor in their
decision was the inappropriate and excessive disciplining of the children.  The Department also decided that it was not
in the best interests of the children to continue its efforts to reunify the children
with T.F. and altered its permanency plan for the children to adoption.  At the termination proceeding held on January
24, 2002, the Department sought termination of the parental rights of all the
parents of the children and introduced additional evidence which we discuss in
detail later in this opinion.  After
hearing all the evidence, the trial court ordered the termination of the
fathers= and T.F=s parental rights to all four of her
children.[1]  This appeal now follows.

DISCUSSION

Termination
of Parental Rights

In her sole issue
for review, T.F. challenges the legal and factual sufficiency of the trial
court=s
findings that:  (1) she knowingly placed
or knowingly allowed her children to remain in conditions or surroundings that
endangered the children within the meaning of Section 161.001(1)(D) of the
Texas Family Code and (2) that she engaged in conduct and knowingly placed the
children with persons who engaged in conduct with endangered the physical and
emotional well-being of the children within the meaning of Section
161.001(1)(E) of the Texas Family Code. 
On appeal, T.F. does not challenge the trial court=s finding that termination is in the
children=s best
interest.








The natural right
that exists between parents and their children is one of constitutional
dimension.  Wisconsin v. Yoder,
406 U.S. 205, 233, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15
(1972); see also Holick v. Smith,
685 S.W.2d 18, 20 (Tex. 1985).  For this
reason, statutes authorizing involuntary termination are construed in favor of
the parent and any effort by the State to terminate the relationship is
strictly scrutinized.  Holick, 685 S.W.2d at 20.  Section 161.001 of the Texas Family Code sets
forth the statutory grounds upon which the court may involuntarily terminate a
parent-child relationship.  Tex.Fam.Code Ann. ' 161.001 (Vernon 2002).  Relevant to this appeal, Section 161.001
allows termination if the parent has:

(D) knowingly
placed or knowingly allowed the child to remain in conditions or surroundings
which endanger the physical or emotional well-being of the child;

 

(E) engaged in
conduct or knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional well-being of the child.

 

Tex.Fam.Code Ann. '
161.001(1)(D), (E).

In addition to
establishing one or more of the grounds under Section 161.001(1), the
petitioner must establish that termination is in the best interest of the
child.  Tex.Fam.Code Ann. ' 161.001(2).  Both the grounds for involuntary termination
and the best interest of the child must be proved by clear and convincing
evidence.  Tex.Fam.Code Ann. '
161.001; see In re C.H., 89 S.W.3d 17, 25 (Tex. 2002).  Clear and convincing evidence is defined as
the degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.  Tex.Fam.Code Ann. ' 101.007 (Vernon 2002); In re C.H.,
89 S.W.3d at 25.  In this case,
the trial court found the evidence sufficient on both of the alleged grounds.  On appeal, T.F. does not challenge the trial
court=s finding
that termination was in the best interest of the children.  Therefore, we will affirm if legally and
factually sufficient evidence supports either of the two grounds upon which her
rights were terminated.

Standards
of Review








The Texas Supreme
Court recently clarified the appellate standards of review to be applied to
legal and factual sufficiency challenges in light of the clear and convincing
evidence burden of proof in termination proceedings.  In re J.F.C., 96 S.W.3d 256, 266 (Tex.
2002)(legal sufficiency); In re C.H., 89 S.W.2d
at 25 (factual sufficiency).  AThe distinction between legal and
factual sufficiency when the burden of proof is clear and convincing evidence
may be a fine one in some cases, but there is a distinction in how the evidence
is reviewed.@  In re J.F.C., 96
S.W.3d at 266.  

In reviewing the
legal sufficiency of the evidence in a parental rights termination, an
appellate court looks at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of
fact could have formed a firm belief or conviction that its finding was
true.  Id. at
266.  In order to give appropriate
deference to the fact finder=s
conclusions, the reviewing court must assume that the fact finder resolved
disputed facts in favor of the finding if a reasonable fact finder could do
so.  Id.  This does not mean that a court must
disregard all evidence that does not support the finding, as this could skew
the analysis of whether there is clear and convincing evidence.  Id. 
If, after conducting its legal sufficiency review of the evidence, the
appellate court determines that no reasonable fact finder could form a firm
belief or conviction that the matter which must be proven is true, then it must
conclude that the evidence is legally insufficient.  Id.








When an appellate
court reviews a challenge to the factual sufficiency of the evidence in a
parental rights termination, it must determine whether the evidence is such
that a fact finder could reasonably form a firm belief or conviction about the
truth of the State=s
allegations.  In re C.H., 89
S.W.3d at 25; In re J.F.C., 96 S.W.3d at 266.  The reviewing court should consider whether
disputed evidence is such that a reasonable fact finder could not have resolved
that disputed evidence in favor of its finding. 
In re J.F.C., 96 S.W.3d at 266.  If, in light of the entire record, the
disputed evidence that a reasonable fact finder could not have credited in
favor of the finding is so significant that a fact finder could not reasonably
have formed a firm belief or conviction, then the evidence is factually
insufficient.  In re
J.F.C., 96 S.W.3d at 266.  The
reviewing court should detail in its opinion why it has concluded that a
reasonable fact finder could not have credited disputed evidence in favor of
the finding.  Id.

Endangerment
by Parental Conduct or Omission

To support a
finding under paragraph (E) of Section 161.001(1), the evidence must show that
the parent engaged in a course of conduct which endangered the children=s physical or emotional
well-being.  See Tex.Fam.Code Ann. '
161.001(E); Texas Dep=t of Human Servs.
v. Boyd, 727 S.W.2d 531, 534 (Tex. 1987). 
For purposes of Section 161.001(1)(E), Aendanger@
means to expose to loss or injury; to jeopardize a child=s
emotional or physical health.  Boyd,
727 S.W.2d at 533; Doyle v. Texas Dep=t of Protective & Regulatory Servs., 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied).  While Aendanger@ means more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family
environment, it is not necessary that the conduct be directed at the child or
that the child actually suffers injury.  Boyd,
727 S.W.2d at 533; see In re M.C., 917 S.W.2d 268, 269 (Tex.
1996).  Under Section 161.001(1)(E) the danger to the child must arise solely by the parent=s conduct established by the parent=s actions or by the parent=s failure to act.  Doyle, 16 S.W.3d at
394. 








In addition to the
evidence previously discussed, the State called several witnesses to testify
concerning the alleged physical and emotional endangerment of the children by
T.F.=s
conduct or failure to act.  Randa Foster, the family=s
next-door neighbor and relative, testified about the July 2000 incident which
led to the children=s initial
removal.  On July 7, 2000,
Ms. Foster was outside doing yard work near the fence of T.F. and S.F.=s
trailer home.  Ms. Foster was
getting some boards when she heard some screaming.  When she looked up, she saw T.F. throwing
D.L.L. towards the window and saw D.L.L. hitting it pretty hard.  D.L.L.=s buttocks hit the window frame and her
leg hit the glass of the window.  Ms.
Foster saw T.F. throw D.L.L. violently onto the bed and take off the child=s pants.  Ms. Foster also saw T.F. grab D.L.L.=s
left arm and wrist and yank her up.  Ms.
Foster did not see anything else after that, but did hear a lot of stomping and
D.L.L. screaming.  J.A.L. and E.R.L. were
in the backyard pulling weeds and Ms. Foster surmised that they had been out
there a pretty long time because she herself had been outside for two hours on
what she recalled for a very hot summer day. 
Ms. Foster had never seen this before and remarked that she had
never seen them outside except for that one time because they were usually in
the house.  








In July 2000, all
four children were placed into foster care with Teresa Culberson and her family
in Odessa, Texas.  When the children
arrived, Ms. Culberson noted that E.R.L. was very aggressive, would fly into
fits of rage, and would scream and fight with J.A.L.  Ms. Culberson also observed that E.R.L. was
very introverted and would avoid physical contact with people.  J.A.L. was also very introverted and
antisocial.  J.A.L. indicated to Ms.
Culberson that he always felt like he was a bad person who needed to be
punished and spanked.  When D.L.L. first
arrived, she was out of control, screaming, hollering, and a bit wild, but
during the course of her time with the foster family, Ms. Culberson began to
see improvement in D.L.L.=s
and the other children=s
behavior.  Ms. Culberson recalled,
however, one disturbing incident with D.L.L. in which D.L.L. was play acting
with a doll in her room.  Ms. Culberson
observed D.L.L. throw her doll on the bed and start Abeating
the tar out of her.@  Ms. Culberson asked D.L.L. what she was doing
and told her not to hit things like that and in reply, D.L.L. said Athat=s
what happen when me be bad to mommy, I have to spank you like that.@ 


Ms. Culberson
recalled that from the beginning, the three older children were constantly
worried about ten-month-old Z.K.L. getting some food.  They would ask the Culbersons
if they were going to feed Z.K.L. and would walk over and give him food.  They continued to do this for a while, even
after Ms. Culberson explained that Z.K.L. would be cared for.  It took a few months before the three
children would actually sit down at the table to eat, rather than stand.  Anytime food dropped from the kitchen table, the
three children would go into a panic and freak out.  They would look at each other with
expressions that conveyed their terror. 
Ms. Culberson had the impression that the children thought they were
going to be punished because food had fallen on the floor.  One time, J.A.L. dropped some food and E.R.L.
told him, Ayou=re going to have to eat it.@ 
J.A.L. started screaming and crying, and said AI
don=t have to eat that, I don=t want to.@  E.R.L. told Ms. Culberson that they were made
to eat the food that fell on the floor. 
While in her care, the children never exhibited the behavior of
purposely throwing food on the floor.  








Ms. Culberson
testified about her impression of the children=s
visits with T.F. and S.F.  Ms. Culberson
recalled that E.R.L. age six did not want to go to the visits.  On the first scheduled visit, E.R.L. refused
to go even though he had not seen his mother in a week.  When it was time for the second scheduled
visit, he held onto a chair and refused to go. 
He had also threatened to run away if he was made to go back to his
mother.  J.A.L. would have nightmares and
wet the bed after his visits.  During her
time in Ms. Culberson=s
care, D.L.L. had nightmares continuously and would wet the bed.  When they would return from their visits, the
children would be out of control, just running wild.  Ms. Culberson would then sit them down and
explain the rules and then they would get back into the routine.  

In July and August
of 2000, Dr. Martin Salazar, a clinical psychologist, performed the initial
psychological evaluations for T.F., S.F., and the two older boys, E.R.L. and
J.A.L.  

T.F. indicated to Dr. Salazar that
she had been physically, emotionally, and sexually abused throughout her
childhood.  T.F. also indicated that
Z.K.L.=s
father had been physically abusive to her and that she had lived with another
man who had also been physically abusive. 
In his diagnostic assessments, Dr. Salazar determined that T.F.
displayed mild signs of depression produced by life stressors, which in this
case was a result of the children being removed and her involvement with the
Department.  Dr. Salazar was concerned
about her behavior and coping skills, as well as how she would react if she
became involved in a highly distressed situation.  Dr. Salazar=s
evaluation also indicated a trouble with T.F. being emotionally close to someone.  Based on his evaluation, Dr. Salazar
recommended counseling to help her deal with personal and parenting
issues.  In his opinion, given T.F.=s
current state of functioning, there might be a risk of abuse to the children if
they were returned without T.F. going through these support services.  In subsequent counseling with Dr. Salazar,
T.F. admitted that she overdisciplined some of the
children.  








Dr. Salazar
testified that his psychological evaluation of S.F., T.F.=s live-in boyfriend and now husband,
indicated that S.F. had difficulty controlling his anger and was experiencing a
mixed anxiety depressed mood.  Like T.F.,
S.F. showed symptoms of depression and anxiety brought on by life stressors
from his current involvement with the Department.  Initially, S.F. denied any kind of abusive
behavior towards the children.  However,
S.F. later stated that he did spank the children, but that T.F. was a little
more severe in her disciplining of the children.  Like T.F., S.F. had suffered emotional and
physical abuse in his childhood.  Dr.
Salazar recommended parenting classes and counseling for S.F. as well.  

The psychological
evaluations for E.R.L. and J.A.L. revealed that E.R.L. missed his mother and
S.F., but did not want to return home because Ahis
mom=s mean.@  E.R.L. also told Dr. Salazar that S.F. would
spank them, but that his mother would be a little more severe and slap
them.  In Dr. Salazar=s opinion, E.R.L. displayed mild signs
of anxiety and depression and had mixed emotions about his parents.  J.A.L. mainly appeared depressed and angry
more than anything else.  Like his
brother, J.A.L. had mixed feelings about his parents.  J.A.L. indicated to Dr. Salazar that he was
scared of his parents because they spanked him. 
During subsequent counseling sessions, the children continued to express
some fear of returning to their mother because of being spanked.  In conclusion, Dr. Salazar opined that it
appeared the parents were using excessive discipline, including spanking them on
a regular basis, extended time-outs, yelling, and other extreme disciplinary
methods, that were emotionally detrimental to the children=s development.  Dr. Salazar testified that such treatment
causes serious emotional problems in a child, such that he becomes depressed,
withdrawn, will act out, and become aggressive himself.  This is particularly true if it is frequent
and not balanced with love and affection. 









From May through
June of 2001, Dr. David Koch, a clinical psychologist, performed follow-up
psychological evaluations of T.F., S.F., and the children because the
Department was working with T.F. and her now husband, S.F., on possible
reunification with her children.  In T.F.=s
evaluation, she had told Dr. Koch that she and S.F. had used physical
discipline and had spanked the children. 
T.F. also expressed concern that S.F. had carried it too far and
indicated to Dr. Koch that she did not know how to tell him to stop when she
thought that he had gone too far with this physical disciplining of the
kids.  T.F. was concerned about the level
to which it had escalated and did not know how to tell him to stop being so
rough with the boys.  As a result of T.F.=s
evaluation, Dr. Koch recommended parenting classes with some specific goals in
terms of child discipline.  One of these
goals was to eliminate physical discipline because it had been misused in the
past and had become a problem area.  From
his psychological evaluation of S.F., Dr. Koch determined that S.F. had impulse
control problems and a tendency to act out in a physical manner.  During the course of the evaluation, S.F.
admitted to spanking the children perhaps harder than he should have and that
one of the children had bruises as a result of spanking.  As with T.F., Dr. Koch recommended S.F.
participate in parenting and counseling services and eliminate physical
discipline from their management of the children as this method apparently has
not been effective and could get out of hand. 









From March to
December of 2001, Ms. Terry Valero, a licensed professional counselor, provided
weekly individual and family counseling to T.F., S.F., and the children.  It was Ms. Valero=s
understanding that one of the issues the Department was dealing with was
inappropriate disciplining by the parents and the possible emotional impact on
the children.  T.F. and S.F. regularly
participated in the counseling with Ano-shows@ only in the last month of
counseling.  In their sessions, T.F. and
S.F. gave contradictory explanations for the weed pulling incident, one of the
initial allegations for children=s
removal.  T.F. told Ms. Valero that she
was not to blame because it was S.F.=s idea that the children do weed
pulling as punishment for playing in a vehicle that had been parked outside.  S.F., on the other hand, agreed that the
children=s
punishment was weed pulling, but stated that they were being punished because
he had found E.R.L. on top of D.L.L. sexually acting out.  Ms. Valero discussed the weed pulling
incident with the boys and they told him that they were not given water nor
allowed to return inside.  Ms. Valero
concluded that the children were quite affected by this incident and were
afraid it was going to happen again.  

During the sessions,
T.F. shared with Ms. Valero her perception of how the children felt about
her.  T.F. stated that she believed the
children were probably afraid of her because of the spankings and harsh
punishments in the past.  T.F. indicated
that in the past, she had engaged in other forms of discipline, in addition to
the spankings, that might be deemed excessive. 
T.F. admitted to having had them stand against the wall with their arms
out for thirty minutes.  T.F. indicated
to Ms. Valero that she had learned different or alternative ways of discipline
from the parenting classes.  During the
counseling sessions with S.F., S.F. told Ms. Valero that he had excessively
harmed one of the children as far as spankings that caused bruising.  At one point, S.F. told Ms. Valero that Athere is no excuse for me spanking
[D.L.L] to the point of bruising her.@  Ms. Valero also recalled that T.F. had
expressed concern about S.F.=s
violent tendencies and felt he was too excessive in the spanking.  Ms. Valero also discussed with T.F. her prior
history of drug and alcohol abuse, as well as physical abuse of the children by
her former husband A.L., the older children=s
biological father.  As far as the parents
making progress in the area of discipline, Ms. Valero recalled seeing more
behavioral modification toward the children, but no progress in their insight
and judgment in disciplining the children. 
In her experience with the family, T.F. and S.F. would resort to
punishment immediately without thinking. 









Ms. Valero
observed that the children seemed very detached and would hesitate when
approaching their mother.  She did not
see any attachment between T.F. and the children.  Rather, in her opinion, T.F. had a needy
personality and was constantly asking the children for what she called Aloving,@
which meant demanding hugs and kisses when the children hesitated.  During the nine months of counseling, Ms.
Valero did not see any improvement in attachment or bond.  Ms. Valero recalled that T.F. was very
irritable and angry toward J.A.L. and that there was no warmth or nurturing in
their relationship.  T.F. was warmer and
friendlier with the other children.








In Ms. Valero=s sessions with E.R.L., E.R.L.
expressed fear because of all the spankings that the children had received from
his mother and S.F. with belts, a paddle, and their hands.  E.R.L. also stated that they were made to
stand against the wall with their hands out for a long time and if they put their
hands down, they would get a spanking. 
E.R.L. also mentioned that the children were stealing food at some point
when they lived with T.F., as well as having to drink water out of the
toilet.  Ms. Valero testified that D.L.L.
would tell her over and over that she did not want to go home.  When Ms. Valero would ask J.A.L., he would
become evasive and not respond or just shrug his shoulders.  J.A.L. was the first of the children to go
back home.  When Ms. Valero explained to
J.A.L. that he was going home, J.A.L. expressed no excitement.  When Ms. Valero asked him if he wanted to go
home, J.A.L. did not answer, which concerned Ms. Valero.  In Ms. Valero=s
contact with D.L.L., she noted that D.L.L. expressed fear of her mother.  Before D.L.L. returned home, Ms. Valero asked
her if she had any worries about going home or whether she was afraid of
anything.  D.L.L.=s immediate response was Adon=t
want mamma touching my privates.@  D.L.L. had told Ms. Valero this concern on
several occasions throughout the year and knew that D.L.L. was very concerned
that her mother would do this again. 
D.L.L. was also fearful of pain.  

Ms. Valero had
some reservations about the children=s
safety with respect to the Department=s
decision to place the children back into the home.  Her role in the family=s
case was to continue monitoring the placement through on-going counseling
sessions after the children returned home. 
Ms. Valero found several indicators that led her to believe the children
were receiving excessive discipline again. 
D.L.L. was being spanked for bed wetting and the time-outs for J.A.L.
were getting long.  On one occasion,
J.A.L. was put in time-out for two days for bringing home a bad grade.  Ms. Valero began seeing a pattern, which to
her indicated that the mentality for extreme punishments was still there and
beginning to escalate.  Ms. Valero became
concerned that this pattern was escalating to the point where punishments would
turn into abusive behavior and she saw a high risk of abuse to the children.  During this time, T.F. and S.F. indicated
that they were having fights over how to deal with the children.  In October 2001, during an individual
session, S.F. expressed concern about leaving the children alone with his
wife.  S.F. told Ms. Valero that he did
not trust her and was afraid that she would beat the children or hurt them in
some way because of her anger toward them. 
S.F. also indicated that her punishments were too harsh and that she was
being hateful towards the children.  

Based on Ms. Valero=s concerns and other information, the
Department in December 2001 decided to ask the court for permission to remove
the children and place them back into their care.  Ms. Valero supported their decision and was
concerned that if they were not removed, they would be subjected to additional
emotional or perhaps physical abuse. 
According to Ms. Valero, T.F. and S.F. were continuing their prior
pattern and the same mentality with regard to discipline in which punishments
were gradually escalating to more harsh measures.  








After the children
came back into care, Ms. Valero continued to have weekly sessions with the
children.  D.L.L. came back very
different, very aggressive and angry.  In
her sessions, D.L.L. would take on a demanding personality in which she called
herself Amommy@ and put Ms. Valero in her role as
D.L.L.  In her role playing, D.L.L. would
threaten Ms. Valero with in her words, Abutt
bustings@
and she indicated in her play that food was removed from her because she did
not listen or was a bad girl.  D.L.L.
would also Aput@ Ms. Valero in her room so to speak and
immediately turn out the lights and shut the door.  D.L.L. would then tell Ms. Valero, Af--- you, you=re
stupid, you=re ugly,
I=m sick of you.@  Ms. Valero recalled that D.L.L. did this on
two occasions.  On the second occasion,
D.L.L. passed by Ms. Valero, slapped her on the shoulder, and said, AI=m
sick of you.@  During doll play, D.L.L. would say to her
doll, AI was
nice to you when you were little, when you were a little baby, but not now.@ 
To Ms. Valero, D.L.L. was exhibiting symptoms of post-traumatic
stress.  In Ms. Valero=s opinion, D.L.L. had been emotionally
abused because she had never said those words before in her prior
sessions.  D.L.L.=s demeanor had significantly worsened
since she had first started seeing her. 
Based on her training and experience, Ms. Valero believed that the child
had been subjected to excessive discipline from which she was likely to develop
emotional problems.  From her sessions
with J.A.L. after he was placed in care, Ms. Valero noted that J.A.L.=s
demeanor remained very flat, that he is numb emotionally, and as a form of
protection refused to feel anything.  








T.F. testified at
the termination proceeding and denied that her ex-husband physically or
emotionally abused her, though he did hit their children with his hand and a
belt.  T.F. did not recall seeing any
bruising from his disciplining of the children. 
T.F. also denied using drugs while pregnant with any of her children or
drinking alcohol after finding out that she was pregnant with her second
child.  On cross-examination, T.F.
expressed her love for her children and her desire to have the children back.  T.F. also asked the court to give her a
chance to continue working with the Department on the parenting skills she
needs to take care of the children.  

In the present
case, the State=s
evidence showed that T.F.=s
conduct during the course of the Department=s
intervention was such that the Department and Ms. Valero feared for the
children=s
emotional well-being and believed that there was a significant risk of physical
abuse because T.F. had resumed her excessive disciplining methods.  Viewing all the evidence in a light most
favorable to the trial court=s
finding, we conclude that a reasonable trier of fact,
in this case the trial court could have formed a firm belief or conviction that
its finding as to whether T.F. engaged in conduct that endangered her children=s physical or emotional well-being, was
true.  See In re J.F.C., 96 S.W.3d at 266.  Therefore,
we conclude the evidence was legally sufficient to support the trial court=s finding under Section 161.001(1)(E) of the Texas Family Code.  Furthermore, after carefully reviewing the
entire record, we conclude the evidence was factually sufficient to support the
trial court=s finding
under Section 161.001(1)(E) because the trial court as
fact finder could reasonably form a firm belief or conviction about the truth
of the State=s
allegations.  In re
C.H., 89 S.W.3d at 25.  Only
one finding alleged under Section 161.001(1) is necessary for a judgment of
termination.  In re
S.F., 32 S.W.3d 318, 320 (Tex.App.--San Antonio
2000, no pet.).  Because we have
concluded that the evidence is legally and factually sufficient to support the
trial court=s
findings under Section 161.001(1)(E), we need not
address the sufficiency of the evidence under Section 161.001(1)(D). 

 








We affirm the
trial court=s
judgment.

 

 

July
3, 2003

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 5

McClure, J., Chew, J., and Preslar, C.J. (Ret.)

Preslar, C.J. (Ret.)(Sitting by Assignment)











[1]
The father of E.R.L., J.A.L., and D.L.L. voluntarily relinquished his parental
rights during the termination proceeding. 
The trial court also terminated the parental rights of Z.K.L.=s
father.  Only the mother=s parental rights are at issue in this
appeal.