**Joyce Marie DOYLE, Appellant,**

v.

**THE TEXAS DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES, Appellee.**

No. 08–99–00037–CV.

Court of Appeals of Texas,
El Paso.

Feb. 25, 2000.

Rehearing Overruled May 3, 2000.

Mara Asya Blatt, Law Offices of Mara Asya Blatt, Stuart L. Leeds, El Paso, for Appellant.

Maria B. Ramirez, Jose R. Rodriguez, County Atty., Michael J. Alvarez, El Paso, for Appellee.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

"Now this Court is faced with the question of, should a person sell their parental rights for a monthly adoption subsidy? And what price should a person put on their parental rights?"

With these words, trial counsel for Joyce Marie Doyle set the stage in defense of this suit to terminate her parental rights to T.D. and J.D., two of her four children. Finding the evidence legally insufficient to support termination under either of the statutory grounds enunciated in the trial court's order, we reverse and render.

### FACTUAL SUMMARY

Doyle is the mother of four children, eighteen-year-old L.D., seventeen-year-old P.D., sixteen-year-old T.D., and fourteen-year-old J.D.[1] After L.D. alleged in September 1995 that Doyle had physically abused her, the Texas Department of Protective and Regulatory Services ("Department") became involved with this family. Although that allegation was not validated, the Department validated a subsequent complaint the next month involving extensive bruises on L.D. which were likely caused by a belt. The Department removed L.D. from the home at that time, but it did not attempt removal of the other children because there was no concern that Doyle would harm them.

---

1. The children's father, James Doe, has not been involved in the lives of the children and he did not appear at the termination hearing. The trial court also terminated his parental rights to both children.

During the course of the next three years, all four children were removed and placed outside of the home due to allegations of physical abuse and neglect, and concerns about Doyle's purported alcoholism. Doyle complied with some aspects of the service plan designed for family preservation, but ultimately, the Department was unable to reunify the family due to Doyle's alleged failure to provide a stable home.

T.D. and J.D. were eventually placed with a maternal niece in St. Louis, Missouri. The children adjusted well to that placement and the niece agreed to not only provide for the children's needs until they reach eighteen years of age but also to adopt the children. The niece additionally agreed to allow Doyle contact with the children so that the familial bond was not broken. On November 10, 1998 [2], the Department filed suit for termination of Doyle's parental rights to T.D. and J.D. on the grounds of physical and emotional endangerment.[3] *See* Tex.Fam.Code Ann. § 161.001(1)(D), (E)(Vernon Supp.2000). Following a bench trial, Doyle's parental rights to T.D. and J.D. were terminated.[4]

## SUFFICIENCY OF THE EVIDENCE

In her sole issue for review, Doyle complains that the evidence is legally and factually insufficient to establish the statutory requisites for involuntary termination. The natural right that exists between parents and their children is one of constitutional dimension. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Clark v. Dearen*,

715 S.W.2d 364, 366 (Tex.App.—Houston [1st Dist.] 1986, no writ). For this reason, statutes authorizing involuntary termination are construed in favor of the parent and any effort by the State to terminate the relationship is strictly scrutinized. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985); *Ybarra v. Texas Department of Human Services*, 869 S.W.2d 574, 576 (Tex.App.—Corpus Christi 1993, no writ); *Clark*, 715 S.W.2d at 368. Section 161.001 of the Texas Family Code sets forth the grounds upon which the court may involuntarily terminate a parent-child relationship. Tex.Fam.Code Ann. § 161.001. Relevant to this appeal, Section 161.001(1) allows termination if the parent has:

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

Tex.Fam.Code Ann. § 161.001(1)(D), (E).

In addition to establishing one or more of the grounds under Section 161.001(1), the petitioner must establish that termination is in the best interest of the child. Tex.Fam.Code Ann. § 161.001(2). Each of these elements must be established by clear and convincing evidence. Tex.Fam.Code Ann.

2. The clerk's record contains only the third amended petition, which was filed on November 10, 1998. Our review of the docket sheet indicates that the second amended petition, filed on December 2, 1997, sought termination and/or managing conservatorship. We cannot ascertain whether the Department sought termination as to Doyle, the children's father, or both in the earlier pleading. Further, the docket sheet does not indicate the nature of the relief sought in the first amended petition, which was filed October 15, 1997.

3. Claudia Munoz, a caseworker, testified that the Department was ordered by the associate judge to file a petition for termination.

4. P.D. was placed in High Frontier Residential Treatment Center in October of 1996 where he remained until December 14, 1998, the day before the termination trial. The Department did not seek termination of Doyle's parental rights to P.D.; instead, it sought permanent managing conservatorship which the trial court granted in the same order. Doyle does not appeal that portion of the order.

§ 161.001; *see Holick,* 685 S.W.2d at 20; *In the Interest of B.R.,* 950 S.W.2d 113, 117 (Tex.App.—El Paso 1997, no writ). "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM.CODE ANN. § 101.007 (Vernon 1996); *B.R.,* 950 S.W.2d at 117. It is an intermediate standard of proof, falling between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *B.R.,* 950 S.W.2d at 117. In this case, the trial court found the evidence sufficient on both of the alleged grounds. Therefore, we will affirm if legally and factually sufficient evidence supports either of those two grounds and the finding that termination is in the best interest of the children.

### Standard of Review

 A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. There are basically two separate "no evidence" claims. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law". When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding". *See Creative Manufacturing, Inc. v. Unik,* 726 S.W.2d 207 (Tex.App.—Fort Worth 1987, no writ). The standard of review requires a determination by the appellate court as to whether, considering only the evidence and inferences that support a factual finding in favor of the party having the burden of proof in a light most favorable to such findings and disregarding all evidence and inferences to the contrary, there is any probative evidence which supports the finding. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Southwest Craft Center v. Heilner,* 670 S.W.2d 651 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *Terminix v. Lucci,* 670 S.W.2d 657 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). If more than a scintilla of evidence supports the finding, the "no evidence" point fails. *Tseo v. Midland Am. Bank,* 893 S.W.2d 23, 25 (Tex.App.-El Paso, 1994, writ denied); *Hallmark v. Hand,* 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied).

### Section 161.001(D) & (E)

 For purposes of Section 161.001(1)(D) and (E), "endanger" means to expose to loss or injury or to jeopardize a child's emotional or physical health. *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *Hann v. Texas Department of Protective and Regulatory Services,* 969 S.W.2d 77, 82 (Tex.App.—El Paso 1998, writ denied); *Edwards v. Texas Department of Protective and Regulatory Services,* 946 S.W.2d 130, 138 (Tex.App.—El Paso 1997, no writ). While "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd,* 727 S.W.2d at 533.

### Environmental Endangerment

 Section 161.001(1)(D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional well-being. *Hann,* 969 S.W.2d at 82; *In the Interest of H.C. and S.C.,* 942 S.W.2d 661, 664 (Tex.App.—San Antonio 1997, no writ). This provision addresses the child's surroundings and environment rather than parental misconduct, which is the subject of Section 161.001(1)(E). *See Ybarra,* 869 S.W.2d at 577. In support of this ground, the Department relies solely on evidence pertaining to the home in which the children lived

in July 1995. When the Department first became involved with the family in 1995, Doyle and the children shared a small one- or two-bedroom apartment with eight to ten other people. The apartment was infested with roaches and the oven and stove were inoperable. Doyle admitted to an investigator for Child Protective Services that the crowded living conditions and resulting stress caused her to strike L.D. on one occasion. Doyle acknowledged that the home was an inappropriate place for the children to live but she rejected suggested alternatives, including the Salvation Army, the Rescue Mission, and the Transitional Living Center, as being "beneath her." With the assistance of the Department, the family eventually moved out of this apartment in November of 1995.

The Department offered no testimony, expert or otherwise, to establish that the conditions in this home endangered the physical or emotional well-being of the children. While there is evidence that the family lived in an over-crowded home and that this stressor caused Doyle to strike her eldest daughter on one occasion, this evidence is not legally sufficient to demonstrate endangerment to the remaining children. This is particularly true in light of the following testimony by Wayne Brock, the Child Protective Services specialist assigned to the investigations unit:

> QUESTION BY THE AD LITEM: Now, you stated that when you investigated, you only removed [L.D.]; is that correct?
>
> ANSWER BY WAYNE BROCK: That's correct.
>
> Q: So obviously you weren't afraid that Ms. Doyle was going to hurt the other children since you didn't remove the other children, correct?
>
> A: That's correct.

Similarly, the evidence demonstrating that the apartment was roach-infested and that the stove and oven did not work, while certainly not an ideal environment for children, does not rise to the level of endangerment to the physical well-being of T.D.

and J.D. sufficient to establish a violation of the statute. The Department offered no evidence that the children were malnourished as a result of not having a stove in the home or that conditions in the apartment were so unsanitary or otherwise inadequate that the children's health was threatened. *Compare In re M.C., D.C. and C.W.*, 917 S.W.2d 268, 270 (Tex.1996)(mother jeopardized her children's health by allowing them to live in extraordinarily unsanitary conditions where evidence showed that home was infested with roaches, the children ate food off the floor and out of the garbage, floor and furniture were littered with food, dirty clothes, garbage, and feces, and children were extremely unclean to the point that they often wore soiled diapers and clothes, and sometimes had dried food, feces, and mucus on their skin and clothes). In fact, Wayne Brock testified that while the apartment was not neat and orderly, "it wasn't like a neglectful situation where there was soiled clothing or food all over. It was in fairly good condition." Moreover, Doyle resolved the housing deficiencies by moving from the apartment with the children three full years before the Department ever filed the termination suit. Accordingly, we find the evidence legally insufficient to establish a violation of Section 161.001(1)(D).

### *Endangerment by Parental Act or Omission*

 Under Section 161.001(1)(E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Hann*, 969 S.W.2d at 82; *Edwards*, 946 S.W.2d at 138. In support of this ground, the Department relies on testimony that Doyle physically abused T.D. and J.D. or placed them with other persons who abused them, neglected them, and failed to provide them with a stable home.

When Doyle moved from the overcrowded apartment, she and the children

lived with her cousin, Patricia Doyle. On November 21, 1995, the Department received an intake that Patricia Doyle had physically abused T.D. Doyle and the caseworker, Dornase Britton,[5] decided that the family should move to the Reynold's House. A few weeks later, Doyle left the children at the Reynold's House while she went to Albuquerque, New Mexico, to visit her father who had fallen ill from a stroke. When Britton discovered that Doyle had left the children unattended, she placed them in foster care with Doyle's sister, Mary Doyle Hall. Doyle had no contact with her children during her absence. After Doyle returned to El Paso on January 8, 1996, she was not permitted to resume her residence at the Reynold's House because she had violated its rules by drinking alcoholic beverages in her room. Consequently, Britton placed T.D. and J.D. at the Child Crisis Center for approximately two weeks. Other facilities refused to accept the children because of an unfavorable history with Doyle, so Britton eventually placed both children with their maternal grandmother, Mildred Doyle. During this time, Doyle did not have a stable residence but she occasionally stayed with her mother. When Doyle obtained an apartment which the Department considered appropriate, the children returned to live with her. Within a short time, however, Britton received a subsequent intake alleging that Doyle had struck L.D. with a wooden spoon and that she had struck P.D. with a leather strap. As a result, the Department filed a petition for removal, and on May 17, 1996, L.D. and P.D. were removed from the home. The Department did not try to remove the two younger children, T.D. and J.D., because Doyle had obtained suitable housing, the younger children were not in immediate danger, and both had a strong bond with their mother. In June of 1996, Doyle attended a service plan meeting with the Department and indicated her willingness to comply with the elements of the plan, including enrolling in counseling sessions and submitting to a psychological evaluation.

Following a hearing on July 11, 1996, the trial court ordered Doyle to find employment within thirty days, to refrain from using alcohol, and to submit to breathalyzer testing. Doyle did not submit to any of the fifteen breathalyzer exams scheduled for her between July and the next hearing in December of 1996 because Doyle obtained a chemical assessment which revealed that she was not chemically dependent on either drugs or alcohol. She also did not obtain employment as ordered. Also in July 1996, Doyle threw T.D. out of their home so that the child was forced to live with a cousin. When T.D. returned to live with her mother in mid-July, Doyle allegedly struck her on two different occasions. T.D. reportedly had bruises and scratches from the second incident. That same month, T.D. reported the two incidents to Claudia Munoz, the then-current caseworker,[6] and stated that she was afraid to go back home because of what Doyle might do upon finding out that the child had reported it. When confronted by Munoz, Doyle denied striking T.D. but admitted pushing her.[7] The Department removed T.D. and J.D. from the home and placed them in the Child Crisis Center for a few days and then in a foster home before finally placing them in the El Paso Center for Children in Sep-

5. Wayne Brock testified that he ultimately transferred this case to family preservation. Dornase Britton was assigned as the in-home preservation caseworker in November 1995.

6. Claudia Munoz took over the case in June 1996.

7. At trial, T.D. denied that her mother had hit her. "And it wasn't true what I said. And the reason why I said it was because, I don't know, that day I had got a report card or something. I got my progress report, and I was scared because I had got bad grades, and I didn't want my mom to hit me. And I told Claudia a lot of things that wasn't true, and she took us away from my mom."

tember of 1996 where they remained until June of 1998.

While in the El Paso Center for Children, the children received counseling from Warren Brown, director of the foster care program. Brown observed that T.D. and J.D. had what he termed developmental and environmental problems as well as a lack of socialization skills. J.D. "acted out" by stealing and T.D. had "intermittent explosive disorder with some depression also." More specifically, T.D. destroyed property and acted aggressively toward younger children in the foster homes. According to Brown, improvements in the children's behavior occurred during the periods when they did not have contact with Doyle. He viewed Doyle's sporadic visitation with the children as provoking further difficulty for both children in the context of their foster care because she acted as their rescuer so they did not have to accept the natural and logical consequences of their behavior. The children were strongly bonded with their mother and she gave them the message that they did not need to bond with anyone else. Following these visits, the foster parents reported that the children had increased anxiety because Doyle had told them that they would be able to return to live with her. As a result of these difficulties, T.D. had fifteen different placements while J.D. had to be moved five times because the foster parents could not work with them.

While the children were in foster care, Doyle moved into a home which she shared with one or two of her brothers. Following a drug raid at the home in which drugs were found in the possession of one of the other residents, the Department decided against reunification.[8] Doyle later moved into a different home with one of her mother's friends and Patricia Doyle. The Department refused to allow the children to return to that home so long as Patricia resided there. During this entire time period, Doyle made little effort to secure employment despite encouragement from her caseworker and even though it was a condition of her service plan. On June 26, 1998, the children were placed with Doyle's niece and her husband, LaQuita and John Downing, in St. Louis, Missouri. They remained there until the time of trial.

### Physical Abuse

With regard to the allegations of physical abuse, the evidence reveals validated claims that Doyle struck L.D. in October 1995 and in April 1996. There was additionally a validated claim that Doyle struck P.D. with a leather strap in April 1996. However, termination was not sought as to either of these children.[9] There were no allegations of physical abuse toward J.D. As for T.D., although the child later denied it, she related to a caseworker a description of a physical confrontation at worst and physical discipline at best. Although Doyle denied striking T.D., she admittedly pushed her. And while there were no allegations of physical abuse after July 1996, it does not appear that any of the children resided with Doyle after that date.

Nevertheless, despite these allegations, the Department did not seek termination until more than two years later. In fact, even at trial, the Department was not relying upon these instances of physical force as a basis for termination. One of the caseworkers, Claudia Munoz, testified that

---

**8.** The children were not living in the home at the time of the raid. Although the caseworker could not remember whether Doyle was there at the time, she was certain that Doyle was not involved with the drugs and she was never charged with an offense.

**9.** L.D. was 18 by the time of trial. As for P.D., the caseworker testified:

[P.D.] is 16. He's about to be 17 in March. He's older. I believe that he would benefit from receiving services for preparation for adult living, as well as receiving the benefits of staying in foster care until he's 18.

the Department pursued a plan of family reunification up until September 1997. The obstacle to reunification with the mother was that "Ms. Doyle has not been able to demonstrate to the Department that she's able to provide a stable home for the children and that she's able to keep a stable job and provide for the children's needs." The State emphasized stability, not physical abuse, in its final argument:

> The focus of the Family Code ... is permanency. And as you well know, the policy of this Court is that permanent foster care is not a permanency plan. There is no way that the Department can advocate that a 13–year–old child remain in foster care for five more years.

While we certainly do not condone the physical abuse directed by Doyle toward her children, neither do we believe that the Department can rely upon a handful of instances more than two years before trial when in the intervening months, Doyle completed counseling and nurturing classes and· submitted to a psychological evaluation. We must also confess that we are troubled by the caseworker's testimony that the Department did not even pursue termination until ordered to do so by an associate judge and only then as a result of the drug raid at the home in which Doyle lived, not as a result of any physical abuse.˙ We turn now to the stability argument.

### STABILITY

■■■ The Department next urges that Doyle's failure to locate and maintain stable employment so that she could provide for the children's needs and her failure to provide · a stable home for the children violates Section 161.001(1)(E). Ordinarily, the stability of the home is one of the factors that should be examined in ascertaining the best interest of a child. See Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex.1976); Hann, 969 S.W.2d at 83. Depending on the evidence, it is possible that a parent's fail-

ure to provide a stable home and otherwise provide for the children's needs may contribute to a finding that termination is appropriate. See Ziegler v. Tarrant County Child Welfare Unit, 680 S.W.2d 674, 678–79 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.)(repeated and severe abuse of one child by both of mother's husbands, coupled with mother's history of general instability, her inability to hold a job, her general insecurity, and her propensity for dependency upon men she knew to be wife and child abusers, supported termination of mother's rights to all of her children). We are not presented with those kinds of facts in this case.

■■■ It is undisputed that Doyle did not obtain stable employment during the Department's early involvement with her family, and consequently, the family had a presumably meager income. The Department did not, however, offer any evidence to establish the level of the family's income or show how the family's poverty impacted the children either physically or emotionally. For example, there is no evidence that the children were not adequately fed or clothed as a result of Doyle's failure to obtain employment and we have already determined that the evidence is legally insufficient to support a finding of endangerment from the children's environment. In the absence of such evidence, we will not conclude that a showing of poverty, standing alone, demonstrates endangerment under this section. See Clark, 715 S.W.2d at 366–68 (absent medical or psychological evidence of harm, extreme poverty is not a sufficient ground for termination of parental rights); see also Ybarra, 869 S.W.2d at 578–80 (absent medical or psychological testimony to establish effect on children, evidence of extreme poverty is factually insufficient to show endangerment from environment). While there is evidence that T.D. and J.D. experienced developmental and behavioral problems, there was no testimony relating the children's difficulties to their poverty or to Doyle's alleged failure to provide for their

physical needs or to provide them with a stable home.

In fact, the record reveals that by the time of trial in December 1998, Doyle was earning $643 a month babysitting her niece's children. She had been steadily working since October 1997. She had completed nurturing classes, had attended therapy sessions, had been successfully discharged from therapy, and had completed her high school equivalency degree. As a result of her efforts, she anticipated the return of her children. But as Doyle's attorney commented in his opening statement, the tables were turned:

> But the bottom line is that at this point in this case, it's all about money. Because Joyce Doyle, the mother of these children, agreed to have those children placed in a relative placement, to be placed with her niece in St. Louis, Missouri, the Department wanted her to do that and she did it. And they told her, We won't terminate your rights, or, We won't seek termination if you agree to this relative placement. And she did so. Now they are reneging on their contract. They are reneging on their promise.
>
> She entered into that contract in good faith, and she agreed and is fulfilling her part of it. She signed off and allowed her kids to go to St. Louis just like the Department wanted them to.
>
> Again, the county attorney had said, You either relinquish your rights or you pay child support.
>
> She said, I can't. I can't afford to pay child support. You told me to get a house. The little money I make goes to that. Now you want me to pay child support. She said, I can't afford both. And then, finally, she came around and said, Okay, I'll pay child support.
>
> At that point the County Attorney's office got mad, and they said, No, forget it. It's no longer or [sic] pay child support. It's now relinquish or terminate.

Despite the fact that the State did not seek termination on the basis of her nonpayment of child support, it nevertheless focused on the support issue in its final argument:

> The Respondent Mother, yes, she complied with most of the elements of her service plan. But it is a basic part of being a parent to be able to provide a suitable home and to provide for the children financially. And there has been no effort on behalf of the Respondent Mother. In two years, not one penny of child support paid.

Not surprisingly, Doyle's attorney framed the issue somewhat differently: "The only reason we are here is that this lady refuses to relinquish her parental rights in exchange for an adoption subsidy." The following testimony of Claudia Munoz, one of the caseworkers, reflects the debate of stability vs. subsidy:

> QUESTION BY THE STATE: Ms. Munoz, in light of your testimony that the Respondent Mother and the children are significantly bonded, why is it your position that it's in the best interest of the children to terminate parental rights?
>
> ANSWER BY CLAUDIA MUNOZ: Because the Department has been involved for over two years now. The children are now in the home of a relative who is willing to provide the kids for their needs until they age out. They are also willing to adopt the children if they become legally free. And they are in agreement with Ms. Doyle keeping contact with the kids, which would allow the children to keep that bond that they have with Ms. Doyle.
>
> Q: Then why not just name the relative as permanent managing conservator without termination?
>
> A: Because it would be a financial hardship for the family.
>
> Q: How would termination remedy that problem?
>
> A: They could receive adoption subsidies.

. . .

QUESTION BY DOYLE'S COUNSEL: And basically, what it comes down to is the adoption subsidy; isn't that correct?

ANSWER BY CLAUDIA MUNOZ: Basically, what it comes down to is that the kids need to be in a stable home.

Q: They are, right?

A: Yes. And that the Department does not need to stay involved in their lives until they are 18.

Q: So the Department wants out of this case?

A: I don't think there is any need for us to stay in the case if there is a stable home for them.

Q: Is that a reason to terminate her parental rights, because the Department doesn't see a need to stay in the case?

A: Ms. Doyle hasn't demonstrated that she can take her kids back at this time.

Q: That's not what I'm asking you. I'm asking you, when the county attorney asked you to articulate the reasons why it was in the best interest to terminate, I believe you stated that it came down to the adoption subsidy?

A: It came down to providing stability for the kids.

Q: The kids already have stability, right?

A: Well, if the Department stays involved, there is a risk that the kids could be removed from that home later.

Q: Okay. You are suggesting that the Department should not stay involved in this case?

A: I'm suggesting that if there is a home for the kids and there's a family who is willing to adopt the kids, that the kids deserve that opportunity.

Q: But these kids don't want to be adopted, do they?

A: They want to go back to their mother.

. . .

QUESTION BY THE AD LITEM: Now, the children have stability right now with a relative placement; is that correct?

ANSWER BY CLAUDIA MUNOZ: Yes.

Q: If the Department does not want to be involved in their lives anymore, you can dismiss the case and you can make the relative permanent managing conservator of the children; is that correct?

A: Yes.

Q: And that would mean no more Department intervention, correct?

A: Correct.

Q: But the reason that you are moving for termination is because you want that relative placement to get a monthly stipend, correct?

A: It would be a financial hardship for them.

Q: And the only way to do that is either adoption, correct?

A: Yes.

Q: And there's another way to do that, correct? If the Department were managing—permanent managing conservator, then you could leave the children in that placement and you could provide a monthly stipend to that relative placement, correct?

A: Yes.

Q: So the mother's rights do not have to be terminated in order for the children to have stability and in order for the children to be financially stable, correct?

A: They don't have to be terminated for us to get PMC and for them to get foster care reimbursement.

While Doyle's efforts, or lack thereof, may well have justified the Department's decision not to pursue family reunification, we

are not persuaded that the State has established that Doyle's instability endangered the physical or emotional well-being of her children.

## ABANDONMENT

 Finally, the Department asks us to infer physical and emotional endangerment from Doyle's conduct in leaving the children unattended at the Reynold's House for a period of three weeks between December 17, 1995 and January 8, 1996. It did not, however, offer any evidence that the children were subjected to physical or emotional endangerment from this conduct. We recognize that there is a potential for physical and emotional endangerment when a parent leaves a child alone for several weeks. But even the Department did not believe that to be the case at the time:

> QUESTION BY THE STATE: Did you ask her with whom she had left her children?
>
> ANSWER BY DORNASE BRITTON: Yes. And she had not left them with anyone. They were left at the Reynold's Home.
>
> Q: Now, at that time you still had not filed a petition, is that correct?
>
> A: That's correct.
>
> Q: Why?
>
> A: Due to the situation, the crisis with her father, I wanted to consider her feelings and emotional things she could have been going through at that time. I did inform her, however, it was not appropriate for her to have left the children without any supervision whatsoever, and that was one of the reasons as well that she was kicked out of the Reynold's Home.

There is no allegation that Doyle left the children unsupervised on any other occasion. And the Department anticipated family reunification until September 1997, when it determined that Doyle could not provide a stable home environment. It did not pursue termination until November 1998, some thirty-four months later, and only when ordered to do so, not as a result of this event but because of a drug raid at the home in which Doyle was living. Under these circumstances, we find the potential endangerment inadequate to establish a violation of Section 161.001(1)(E). For all of these reasons, there is no more than a scintilla of evidence to establish a violation of Section 161.001(1)(E).

## CONCLUSION

Doyle's sole point of error is sustained and the order terminating Doyle's parental rights to T.D. and J.D. is reversed and judgment is rendered that the parental rights of Appellant be reinstated.