Becker v. State
















COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

JESUS MANUEL CASTANEDA and                ) 
JESSICA CASTANEDA,                                   )                  No. 08-03-00399-CV
)
                                    Appellants,                       )                             Appeal from
)
v.                                                                          )                  70th District Court
)
TEXAS DEPARTMENT OF PROTECTIVE     )                  of Ector County, Texas
AND REGULATORY SERVICES,                   )
                                                                             ) (TC# A-2370-PC)
                                    Appellee.                          )

O P I N I O N

            Jesus Manuel Castaneda (Jesse) and Jessica Castaneda appeal from a judgment
terminating their parental rights. A jury found that Appellants had endangered the physical and
emotional well-being of their son, Jude, and that termination was in the child’s best interests. We
affirm.
FACTUAL SUMMARY
            Because Appellants raise both a legal and factual sufficiency complaint, we will provide a
detailed review of the evidence. On December 31, 2001, four-and-a-half month old Jude was taken
to the emergency room for a respiratory problem. He was diagnosed with both RSV


 and
pneumonia, but a chest x-ray revealed a broken collarbone and multiple rib fractures. The
emergency room physician ordered additional x-rays and discovered that Jude also had a fractured
left leg and left arm. These injuries were in different stages of healing. The fractured leg bone,
described as “fresh,” was the most recent injury. The treating physician noticed that Jude appeared
to be in pain any time he was touched.  
Circumstances of the Birth
            Jessica suffered from severe toxemia during pregnancy and was diagnosed with
preeclampsia. Jude was born approximately six weeks prematurely and weighed five pounds at
birth. When he was only two to three weeks old, Jessica noticed that he had a bruise on his left ankle
which looked like it had been caused by a finger wrapped around his ankle. Jessica believed her
husband had caused the bruise while changing the baby’s diaper. He also had circular bruises on his
abdomen and torso which looked like they had been caused by fingertips. According to Jesse, the
baby began having health problems related to allergies at the age of two months. Consequently, he
was switched to several different formulas in an effort to relieve the allergies and colic.
Circumstances of the Injuries
            On December 17, 2001, Jessica planned to take Jude to the doctor for a routine checkup and
immunizations. As she was leaving her home, Jude tumbled from his car carrier because he had not
been buckled in when she picked it up. He hit the coffee table from a height of a foot and a half to
two feet. Although the doctor examined the child that same day and administered vaccinations,
Jessica failed to mention the fall. A few days later, she noticed that his leg and shoulder were
swollen. She called the child’s doctor, Dr. Desai, to ask whether the immunization could have
caused his leg and shoulder to swell. Once again, she did not mention that he had fallen and Dr.
Desai told her to take him to the emergency room. X-rays revealed a broken collarbone.
            A few days thereafter, Jesse and Jessica became concerned that the baby’s respiratory
problems were not improving and they switched pediatricians. Dr. Violetta Bello began treating
Jude and as part of the medical history, Jessica reported that Jude had a broken collarbone. Dr. Bello
also noticed a swollen leg but Jessica told her that the baby had just received a vaccination in that
leg. On December 30, Jessica became upset when Jesse pulled the baby by the left arm on the side
where the collarbone was broken as he tried to turn him over. As they argued, Jesse threw the
telephone at her, but it hit his toddler daughter.


 Jessica took Jude and went to her mother’s home. 
During their discussion, Jessica’s mother revealed that she had seen Jesse shake the baby on
Thanksgiving Day.  
            On December 31, Jessica called Dr. Bello to report that the child’s respiratory distress had
not improved. Dr. Bello recommended that she take him to the emergency room. The emergency
room physician called Dr. Bello and informed her that Jude had multiple broken ribs and a broken
arm in addition to the fractured collarbone. Additional x-rays revealed that he also had a fresh
fracture of the left femur. Dr. Bello then reviewed the x-rays herself. 
            Medical professionals notified authorities and representatives from the Odessa Police
Department and the Department of Protective and Regulatory Services responded. Teresa Burnett,
an investigator with DPRS, interviewed both Jessica and Jesse. Jessica told her she noticed bruises
on the baby when he was two or three weeks old. One was about an inch wide around his left ankle. 
There were circular bruises on his ribs and chest area “that were like fingers.” Jessica was
nonemotional in their conversation. She denied hurting her baby or knowing anyone who would hurt
the baby but she told Burnett that the injuries must have been caused by her husband. Jesse told her
that he might have broken his son’s ribs by squeezing him. Jesse demonstrated how he held the
infant on his lap and bent forward, squeezing him. He also told Burnett that on another occasion,
he squeezed the child with his hands into a small ball to stop him from crying. Jesse further claimed
that Jude might have been injured when he accidently fell off the bed. Jesse admitted getting into
an argument with Jessica after he pulled Jude by his arm and Jessica accused him of being too rough
with the baby. 
            Two police officers also responded to investigate. Officer Kris Gregg recounted that Jesse
said his wife and mother-in-law complained that he was too rough with the child. Jesse explained
that the baby’s injuries might have been caused from his “crunching” or “scrunching” the baby into
a ball to get him to stop crying. The officer demonstrated that he did it “[b]y folding the baby in half
forward, with the legs touching the head, the feet touching the head.” Jesse also told him about an
incident where the child was spitting up milk and Jesse tried to “squeeze” his son “in an attempt to
get all the milk out so that it wouldn’t be able to spit anything else up.” The jury watched the
videotaped investigation in which Jesse demonstrated these events himself. Detective Darryl Smith
testified to the difference between the grandmother’s taped statements and her trial testimony. On
tape, she said she saw Jesse shake the baby on Thanksgiving Day. By the time of trial, she had
backed away from her statements to police.
            The jury also heard evidence concerning Jude’s condition when he was transported to foster
care. The baby had a startle reflex “where his little hands would, like, go up to the side and they
would shake like he was afraid.” He screamed every time he was touched. Yet he has thrived with
his foster parent – he runs around, he plays, he laughs and is a healthy baby now. Significantly, he
has not suffered any broken bones since his placement in foster care.
                                                              Expert Testimony
            Dr. James Sheehan, a diagnostic radiologist, testified to his review of Jude’s x-rays. The
films from December 20 showed an acute fracture of the left clavicle which showed no evidence of
healing. The x-rays from December 31 revealed multiple fractures of the ribs that were healed or
at an advanced stage of healing. A skeletal survey was also performed and reflected numerous
healing fractures. Dr. Sheehan described for the jury how the age of the fractures could be
determined. “Healing fractures produce cloaking of the bone, particularly – cloaking meaning,
calcium around the outside of the bone.” Eleven months later, another skeletal survey showed
additional healing, except that the left thigh bone showed significant residual deformity. It was
angulated and had healed with two centimeters of shortening. He found no evidence of scurvy or
other bone disease. In his opinion, the fractures were caused by abuse. 
            Dr. Bello explained that Jude had tried a number of infant formulas but continued with his
allergies and respiratory problems. She changed his formula again in an attempt to reduce the colic. 
Each of the formulas had provided all the nutrition the baby required and he was gaining weight. 
The vaccinations given were standard and she had never encountered the situation where the vaccine
made the child ill or predisposed him to illness, nor had she ever heard of a child having a broken
bone caused by a vaccination. Dr. Bello also testified that Jessica was not surprised when she found
out the baby had broken bones:
And what really has kept me always wondering about Jude and Mrs. Castaneda is
when I told her about that her son had signs of abuse, that CPS was going to be
involved, and that they will be the ones making the decision, instead of her turning
around and asking me, “How do you” – “How do you think that could happen? I
don’t believe you. You need to prove that to me” or anything, she just teared for one
or two seconds and she turned around and got the phone to call her husband.” 

            Michele Hayley-Disilets, a licensed professional counselor, interviewed both Jessica and
Jesse. She testified that Jessica wouldn’t leave Jesse in order to get the baby back – “I think she felt
like she needed to support him.” In her discussions with Jesse, he demonstrated how he “crunched”
the baby. “And he stated that he was tired of the baby crying so much and that he had become
frustrated.” He also used a stuffed lion to show her how he saw the baby’s head banging up and
down on the bed as if one were shaking him. “He stated that he saw it happening but he didn’t know
if it was he, himself, doing it.”
Q:Did that cause you some concern when he made that statement to you?
 
A:Yes.
 
Q:Why is that?
 
A:Well, I mean, you know, I wondered if he was really lucid or understanding
of what had happened.
 
Q:What about – any further demonstrations with the toy?
 
A:One night when the baby kept throwing up all the time – throwing up his
milk, he picked up the lion, and he said he picked up the baby and repeatedly
squeezed the stomach area, which I’m doing now, squeezing the lion’s
stomach area, and watching the baby vomit. And it was projectile vomiting
and he – he watched the vomit come shooting out of the baby’s mouth. 
When asked, he had no idea why he kept doing this to the baby, except that
it seemed he was sort of fascinated by how it looked.
 
Q:Now, did he tell you he was fascinated or was that your impression of his
demeanor at that time.
 
A:Her used the word fascinated. I have that in quotes. 

Jessica told her that “she felt that we should all ignore” the broken clavicle “and the word ‘ignore’
was hers, because it was accidental and neither of them meant to harm the baby.” 
            Finally, we turn to the testimony of Appellants’ expert witness, which is the crux of their
sufficiency challenge. Dr. Harold Buttram is a physician from Quakertown, Pennsylvania. He is not
board certified in any field, but practices environmental medicine. He has testified as an expert four
times. 
            Dr. Buttram opined that the baby’s injuries were the result of a disease process. Based on
a review of the medical records and interviews with Appellants, Dr. Buttram concluded that the bone
fractures resulted from natural causes. Jessica suffered from severe toxemia during pregnancy
caused by placental vascular insufficiency, and consequently, her doctor delivered the baby at
approximately thirty-five weeks’ gestation. Due to the toxemia and premature birth, Dr. Buttram
believed that Jude had received insufficient prenatal nutrition.


 Insufficient blood flow from the
placenta can cause deficiencies of calcium, vitamin D and vitamin C. Consequently, the child may
have been born with subclinical scurvy and brittle bone disease such that he could suffer fractures
from normal handling. Based on his review of the x-rays, Dr. Buttram believed that the fractures
were of a spontaneous nature. He explained that there are five conditions of brittle bone disease –
rickets, scurvy, osteomalacia, osteogenesis imperfecta [classical brittle bone disease thought to be
due to a zinc deficiency] and temporary brittle bone disease caused by a lack of fetal movement due
to the lack of amniotic fluid or tumors. The tests for rickets and scurvy were not performed; a test
for osteogenesis imperfecta was normal. His opinion was based upon his review of the medical
records, inasmuch as he had not examined the child.
            Dr. Buttram also believed that the administration of vaccines was ill advised and that the
shots had triggered the child’s illnesses. While the fractures probably took place prior to the
vaccinations, the illnesses would have prevented their adequate healing. Simply stated, the recurrent
vomiting contributed to his nutritional deficiencies.
            Dr. Buttram did not testify in terms of reasonable medical probability. Instead, he offered
the following:
Q:Is there any way, Doctor, to absolutely determine that Jude suffered from this
condition?
 
A:The appropriate tests were not done at the appropriate time.
 
Q:Now, there is no possible way of determining it now, so we’re in a situation
where it’s your opinion against possibly other opinions?
 
A:I think we’re dealing with likelihoods here.

Testimony of the Parents
            Jesse testified at trial and recanted his statements during the police interviews which, as we
have mentioned, were videotaped. Excerpts from his trial testimony follow:
Q:So did you intentionally squeeze him or hold him on his tummy to stop him
from spitting up or get him to finish spitting up or what?
 
A:That, I honestly don’t know why I did that. I just did that. 

* * * * *
 
Q:There was also – your statement indicated one or two incidents where you
hold the baby above the mattress and the baby’s head was hitting back and
forth on the mattress. Do you remember those incidents?
 
A:No.
 
Q:You don’t remember them?
 
A:That never happened.
 
Q:Then what was – what was your testimony on the tape referring to?
 
A:That was – the detective kept asking me question after question, and a lot of
them were the same type of question or the same questions over and over. 
And at that time, that was like – from seeing it now, I mean, that was towards
the end and when I – thinking back on that, me saying that, you know, I really
don’t have a reason for saying that, but I know that I never did that. I know
that never happened.
 
Q:So you made it up when you made the statement on the tape.
 
A:That part, yes.
 
Q:You did make that up?
 
A:Yes.
 
Q:Why is that?
 
A:I don’t know. I just said – 
 
Q:You just said it was because it came to your head?
 
A:I said it because I just said it.

* * * * *
 
Q:Now, I did notice on your statement you made reference to one time where
you cut off Jude’s wind. Do you remember making that statement?
 
A:Yes.
 
Q:And do you remember that incident?
 
A:Well, that was at the same time when I stayed up with him that night.
 
Q:And did he – what do you mean by staying that you cut off his wind?
 
A:Well I – when I picked him up like that, when I folded him like that, he had
stopped crying, so what’s what I meant by that, that he wasn’t crying
anymore. 

Jesse acknowledged that the child had fallen off the bed when he left the bedroom to answer the
telephone. 
            Jessica testified as well. She believed that the broken leg may have occurred when the child
was pulled from his swing. She admitted noticing bruises on the baby’s ankle and on the lower chest
right above the stomach. She didn’t mention any of the bruising to the doctors. Yet despite her
knowledge of the bruises and the broken bones, she testified at trial that she was not uncomfortable
leaving the baby with him. “It’s just going to be a lot different. And if he’s alone, I’m not going to
be, you know, trying to set up cameras and stuff. I know that, you know, we’ve spoken and stuff and
he has told me he honestly cannot remember, you know, where he – you know, a time where he
knows, you know, that he’s abusing our child and me either.” 
The Litigation
            The Department filed suit to terminate Appellants’ parental rights based on allegations that
they had knowingly placed or knowingly allowed the child to remain in conditions or surroundings
which endangered the physical or emotional well-being of Jude and had engaged in conduct or
knowingly placed Jude with persons who engaged in conduct which endangered the physical or
emotional well-being of the child. The jury rejected Appellants’ defense, terminated their parental
rights, and appointed the Department as the managing conservator. 
VOIR DIRE
            In Issue One, Jesse contends that the trial court abused its discretion by allowing the
Department to inform the jury panel during voir dire that he had been convicted of criminal
charges related to his son’s injuries. The Department alleged in its pleadings as one of the statutory
grounds for termination that Jesse had been convicted of injury to a child. See Tex.Fam.Code Ann.
§ 161.001(1)(L)(Vernon 2002)(court may order termination of the parent-child relationship if the
court finds by clear and convincing evidence that the parent has been convicted or has been placed
on community supervision, including deferred adjudication community supervision, for being
criminally responsible for the death or serious injury of a child under Section 22.04 of the Texas
Penal Code).
            Prior to trial, Jesse filed a motion in limine seeking to prevent the Department from
mentioning in the presence of the jury “any prior convictions or alleged violations of the law” until
the trial court had determined the admissibility of the evidence. He relied upon Tex.R.Evid. 609
in support for his argument, but he also contended that the probative value of the evidence was
substantially outweighed by unfair prejudice. During the hearing, Jesse’s attorney informed the court
that the trial judge in the criminal case, Judge Watkins, had heard a motion for new trial but had not
yet issued a ruling.


 Finding that Rule 609 related only to impeachment and that Jesse’s criminal
conviction related to the grounds for termination, the trial court denied the motion in limine. The
judge told Jesse’s attorney that she would rule on any objections during trial. Counsel asked the
court to rule on the admissibility of the evidence prior to trial and the judge again ruled that it was
relevant to one of the grounds for termination. 
             During voir dire, the Department’s attorney, Dewey Britt, engaged in the following colloquy
with a prospective juror:
[Prospective juror]:I was wondering if there’s any way for us to know if there was
a previous charge -- same charge or a similar charge. Is there
any way for us to have that information?
 
[Mr. Britt]:You mean if there was a prior CPS investigation on this
family?
 
[Prospective juror]:A charge.
 
[Mr. Britt]:A criminal charge?
 
[Prospective juror]:Un-huh. Or past history.
 
[Mr. Britt]:Sure. And I think it’s in the evidence that you’ll hear that
criminal charges have been brought. Is that what you’re
asking about?
 
[Prospective juror]:Previous.
 
[Mr. Britt]:Regarding different incidents or prior incidents?
 
[Prospective juror]:Un-huh. Prior incidents.
 
[Mr. Britt]:Well, I think the evidence you’ll hear is about the incident
that led up to this. This was a new baby. So you’re asking
about incidents regarding other children that these people --
prior children?
 
[Prospective juror]:Yes.
 
[Mr. Britt]:Well, as far as that goes, it should be all over this incident. 

Jesse did not object. The following morning after voir dire had concluded and the jury had been
selected, the trial court reversed its prior ruling on Jesse’s motion to exclude this evidence. The
court announced that it had reconsidered the ruling because Judge Watkins had granted a new trial
in the criminal case. It then granted Jesse’s motion to exclude the evidence on the basis of
Tex.R.Evid. 403. 
            A motion in limine is designed solely to require an offering party to approach the bench and
inquire into the admissibility of the evidence at issue before introducing that evidence to the jury. 
See Hartford Accident & Indem. Co. v. McCardell, 369 S.W.2d 331, 335 (Tex. 1963); Trevino v.
Texas Department of Protective and Regulatory Services, 893 S.W.2d 243, 249 (Tex.App.--Austin
1995, no writ). The grant or denial of a motion in limine has no bearing on the ultimate admissibility
of the evidence and is never reversible error. Trevino, 893 S.W.2d at 249. Thus, the error, if any,
relates to the discussion of this evidence during voir dire. 
            We first note that the record does not support Jesse’s argument that the Department informed
the jury that Jesse had been convicted of criminal charges arising from his son’s injuries. Britt
merely stated in response to a question that criminal charges had been brought in the case. He did
not specify that criminal charges had been brought against Jesse or that Jesse had been convicted. 
Jesse also remarks in his brief that the trial court denied his motion in limine even though a new trial
had been granted in the criminal case, but the record simply does not bear out this assertion. The
record does not reflect exactly when Judge Watkins granted the motion for new trial but counsel for
Jesse informed the trial court on two different occasions during the pretrial hearing that Judge
Watkins had not yet ruled. At that point and as far as the trial court knew, Jesse had been convicted
of injury to a child and the conviction would have been admissible on the issue of termination under
Section 161.001(1)(L). Under these circumstances, the trial court did not abuse its discretion by
initially ruling that the evidence would be admissible at trial or by impliedly ruling that the parties
could voir dire the jury panel on the issue. See Trevino v. Texas Department of Protective and
Regulatory Services, 893 S.W.2d 243, 249-51 (Tex.App.--Austin 1995, no pet.)(there was no error
by court in proceeding on termination of parental rights in initially granting father’s motion in limine
to prevent any evidence or underlying facts relating to his arrest, conviction, and confession to
involvement in death of his minor nephew to be presented and then reversing its position after
completion of voir dire to allow evidence on conviction and incarceration and to allow parties to
examine jury panel on those issues). Moreover, counsel failed to object when the subject of criminal
charges emerged during the Department’s voir dire. Error, if any, has been waived. Issue One is
overruled.
SUFFICIENCY OF THE EVIDENCE
            In Issues Two through Nine, Appellants challenge the legal and factual sufficiency of the
evidence supporting the jury’s findings relevant to termination of their parental rights. They initially
failed to file a complete appellate record. In response to our inquiry just prior to submission, the
court reporter notified us in writing that Appellants’ attorney specifically requested that she not
include the exhibits in the reporter’s record. Missing from the record were Jude’s birth records, 
hospital records, x-rays, medical records, photographs, and recorded interviews of witnesses which
conflicted, in some respects, with their trial testimony. If an appellant requests a partial reporter’s
record and includes in the request a statement of the points or issues to be presented on appeal, the
appellate court must presume that the partial reporter’s record constitutes the entire record for
purposes of reviewing the stated points or issues. See Tex.R.App.P. 34.6(c)(1), (c)(4). Strict
compliance with Rule 34.6 is not necessary, but some compliance is required. See Bennett v.
Cochran, 96 S.W.3d 227, 228 (Tex. 2002)(appellant did not waive legal and factual sufficiency
complaints where appellant who filed partial record identified issues two months late under appellate
rules, but appellee was not harmed by the delay). If only a partial reporter’s record is requested and
the appellant completely fails to submit a statement of points or issues, the presumption arises
that the omitted portions of the record support the judgment. See Bennett, 96 S.W.3d at 299. 
            During oral argument, we inquired of Appellants’ counsel whether the sufficiency points had
been waived due to his failure to bring forward a complete record. Following argument, counsel
filed a motion to supplement in which he characterized the question as a request that the exhibits be
filed. While the motion was pending, the reporter filed the exhibits.
            The Supreme Court has determined that the appellate rules are to liberally construed so that
decisions of the courts of appeals turn on substance rather than procedural technicality. Crown Life
Ins. Co. v. Estate of Gonzalez, 820 S.W.2d 121, 121 (Tex. 1991). An appellate court abuses its
discretion if pre-submission leave to supplement is denied absent any finding of unreasonable delay. 
Id. Post-submission leave to supplement is frequently denied. Id. at 122. However, the denial of
even post-submission leave may constitute an abuse of discretion. Silk v. Terrill, 898 S.W.2d 764,
766 (Tex. 1995). Given the constitutional dimension of the parent-child relationship, we have
granted the motion and reviewed the exhibits. 
Termination under Section 161.001
            In proceedings to terminate the parent-child relationship, the petitioner must establish by
clear and convincing evidence one or more of the acts or omissions enumerated under subsection (1)
of the statute and must also prove that termination is in the best interest of the child. Tex.Fam.Code
Ann. § 161.001(1), (2)(Vernon 2002); Richardson v. Green, 677 S.W.2d 497, 499 (Tex. 1984). 
Both elements must be established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. Texas Department of Human Services. v. Boyd, 727 S.W.2d
531, 533 (Tex. 1987).
            At issue here are Sections 161.001(1)(D) and (E). The Department alleged that Jessica and
Jesse had each knowingly placed or knowingly allowed their infant son to remain in conditions or
surroundings which endangered the physical or emotional well-being of the child or that they
engaged in conduct or knowingly placed the child with persons who engaged in conduct that
endangered the baby’s physical or emotional well-being. See Tex.Fam.Code Ann. § 161.001(1)(D),
(E). Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or
injury, or to jeopardize a child’s emotional or physical health. Boyd, 727 S.W.2d at 533; Doyle v.
The Texas Department of Protective and Regulatory Services, 16 S.W.3d 390, 394 (Tex.App.--El
Paso 2000, pet. denied). While endangerment means more than a threat of metaphysical injury or
the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct
be directed at the child or that the child actually suffer injury. Doyle, 16 S.W.3d at 394. Subsections
(D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. 
See In the Interest of B.S.T., 977 S.W.2d 481, 484 (Tex.App.--Houston [14th Dist.] 1998, no pet.);
In the Interest of S.H.A., 728 S.W.2d 73, 83-84 (Tex.App.--Dallas 1987, writ ref’d n.r.e.). 
Subsection (D) requires a showing that the environment in which the child is placed endangered the
child’s physical or emotional health. Doyle, 16 S.W.3d at 394. This provision addresses the child’s
surroundings and environment rather than parental misconduct, which is the subject of subsection
(E). Doyle, 16 S.W.3d at 394; B.S.T., 977 S.W.2d at 484; S.H.A., 728 S.W.2d at 84. Under
subsection (E), the cause of the danger to the child must be the parent’s conduct alone, as evidenced
not only by the parent’s actions but also by the parent’s omission or failure to act. Doyle, 16 S.W.3d
at 395; B.S.T., 977 S.W.2d at 484; S.H.A., 728 S.W.2d at 83-84.
Environmental Endangerment
            Conduct of a parent or another person in the home can create an environment that endangers
the physical and emotional well-being of a child as required for termination under subsection (D).
In the Interest of W.S., 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ); D.O. v. Texas
Department of Human Services, 851 S.W.2d 351, 354-55 (Tex.App.--Austin 1993, no writ); In the
Matter of B.R., 822 S.W.2d 103, 105-06 (Tex.App.--Tyler 1991, writ denied). For example, an
environment which routinely subjects a child to the probability that he will be left alone because his
parents or caregivers are incarcerated endangers both the physical and emotional well-being of a
child. See In the Interest of S.D., 980 S.W.2d 758, 763 (Tex.App.--San Antonio 1998, pet.
denied)(parents repeatedly jailed due to illegal drug use and drug-related criminal activity).
Endangerment by Parental Act or Omission
            Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment
of the child’s physical and emotional well-being was the result of the parent’s conduct, including acts
and omissions. In the Interest of R.D., 955 S.W.2d 364, 368 (Tex.App.--San Antonio 1997, pet.
denied); Dupree v. Texas Department of Protective & Regulatory Services, 907 S.W.2d 81, 83-84
(Tex.App.--Dallas 1995, no writ). The conduct to be examined includes what the parents did both
before and after the child was born. In the Interest of D.M., 58 S.W.3d 801, 812 (Tex.App.--Fort
Worth 2001, no pet.); Dupree, 907 S.W.2d at 84. To be relevant, the conduct does not have to have
been directed at the child, nor must actual harm result to the child from the conduct. Dupree, 907
S.W.2d at 84; In re C.D., 664 S.W.2d 851, 853 (Tex.App.--Fort Worth 1984, no writ). Additionally,
termination under subsection (E) must be based on more than a single act or omission; a voluntary,
deliberate, and conscious course of conduct by the parent is required. Tex.Fam.Code Ann. §
161.001(1)(E); In the Interest of K.M.M., 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.). 
The specific danger to the child’s well-being need not be established as an independent proposition,
but may be inferred from parental misconduct. In the Interest of N.K., 99 S.W.3d 295, 300
(Tex.App.--Texarkana 2003, no pet.).
Standard of Review
            Due process requires the application of the clear and convincing evidence standard in cases
involving the termination of parental rights. In the Interest of J.F.C., A.B.C., and M.B.C., 96 S.W.3d
256, 263 (Tex. 2002), citing Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599
(1982). Codifying the constitutional requirement, the Family Code provides that the burden of proof
in termination cases is clear and convincing evidence. Tex.Fam.Code Ann. § 161.001(1), (2). Clear
and convincing evidence means the measure or degree of proof that will produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. 
Tex.Fam.Code Ann. § 101.007 (Vernon 2002). This intermediate standard falls between
preponderance of the evidence of ordinary civil proceedings and the reasonable doubt standard
utilized in criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979). 
            Given this elevated burden of proof, the traditional legal and factual sufficiency standards
of review are inadequate. J.F.C., 96 S.W.3d at 265; In the Interest of C.H., 89 S.W.3d 17, 25 (Tex.
2002). The traditional legal sufficiency standard, which upholds a finding supported by anything
more than a scintilla of evidence, is inadequate when proof by clear and convincing evidence is
required. J.F.C., 96 S.W.3d at 264-65. Instead, review must take into consideration whether the
evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth
of the matter on which the State bears the burden of proof. Id. at 266. To give appropriate deference
to the fact finder, the reviewing court must assume that the fact finder resolved disputed facts in
favor of its finding if a reasonable fact finder could do so. Consequently, a court should disregard
all evidence that a reasonable fact finder could have disbelieved or found to have been incredible,
but it doesn’t require a court to disregard all evidence that does not support the finding. Id. at 266. 
If the court determines that no reasonable fact finder could form a firm belief or conviction that the
matter to be proven is true, then the evidence is legally insufficient.
            In a factual sufficiency review, we must give due consideration to evidence that the fact
finder could reasonably have found to be clear and convincing. Id., citing In Re C.H., 89 S.W.3d
at 25. The inquiry must be whether the evidence is such that a fact finder could reasonably form a
firm belief or conviction about the truth of the allegations. A court of appeals should consider
whether disputed evidence is such that a reasonable fact finder could not have resolved disputed
evidence in favor of its finding. While we do not view the evidence in the light most favorable to
the challenged finding, our review must maintain the respective constitutional roles of juries and
appellate courts. Id. at 26. If, in light of the entire record, the disputed evidence that a reasonable
fact finder could not have credited in favor of the finding is so significant that the fact finder could
not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. 
J.F.R. 96 S.W.3d at 266.
Evidence Related to Statutory Predicate for Termination
            While the medical experts do not dispute the existence of multiple fractures, they do disagree
on the cause. The radiologist reported “numerous healed fractures including rib fractures bilaterally
along with what appear to be more recent fractures of the distal right femoral metaphysis and the
proximal left tibial metaphysis and the left clavical. The multiplicity of bone injuries at different
stages of healing suggest a history of physical abuse.” Dr. Bello reported no evidence of scurvy,
rickets or brittle bones disease. As to the sufficiency of the evidence to support Jesse’s termination,
he admitted “crunching”, “scrunching” and “squeezing” the child. He told the counselor that he was
“fascinated” with watching the projectile vomiting. He admitted to frustration in trying to get the
child to stop crying. Both his wife and his mother-in-law cautioned that he was too rough with the
baby. While the videotape captured his tears while the investigator was out of the room, it also
captured his admissions. His recantations were based solely on Dr. Buttram’s “diagnostic
impression.” Dr. Buttram’s opinion, while in conflict with those of Dr. Sheehan and Dr. Bello, was
a matter of credibility left to the determination of the jury. The evidence is such that the jury could
reasonably form a firm belief or conviction of physical endangerment. In so finding, we have
assumed that the jury resolved disputed facts in favor of its finding if a reasonable fact finder could
do so and we have disregarded all evidence that a reasonable fact finder could have disbelieved or
found to have been incredible. Consequently, it is legally sufficient. Turning to factual sufficiency,
we have considered whether the disputed evidence is such that a reasonable fact finder could not
have resolved the disputed evidence in favor of its finding. While we do not view the evidence in
the light most favorable to the challenged finding, our review must maintain the respective
constitutional roles of juries and appellate courts. Having applied the appropriate heightened
standard of review, we find the evidence factually sufficient as well. 
            The evidence underlying the statutory predicate is also sufficient to terminate Jessica’s rights. 
Despite having told her mother that she was leaving Jesse because he was too rough with the child,
she continued to leave the baby with him. She told the investigator that Jesse must have been the
one to abuse Jude, that she had found the bruises when the child was a newborn, and that the pattern
of bruises resembled fingerprints. She wasn’t surprised to learn of the injuries. She wasn’t willing
to leave Jesse in an effort to regain custody of her son. And at trial, she admitted that she was not
uncomfortable leaving the baby with him. She wasn’t going to use cameras to be sure; it was all just
going to be “different.” Jesse “has told me he honestly cannot remember, you know, where he – you
know, a time where he knows, you know, that he’s abusing our child and me either.” Applying the
appropriate standard of review, the evidence is both legally and factually sufficient to support a
finding of endangerment under subsection (E), which includes both acts and omissions.
Best Interest of the Child
            In deciding whether the evidence is sufficient to support the jury’s finding that termination
is in the child’s best interest, we apply the non-exclusive factors found in Holley v. Adams, 544
S.W.2d 367, 371-72 (Tex. 1976). See also In re Jane Doe 2, 19 S.W.3d 278, 282 n.20 (Tex.
2000)(recognizing that intermediate courts employ the Holley factors to ascertain best interest in
conservatorship cases). Those factors include: (1) the desires of the child; (2) the emotional and
physical needs of the child now and in the future; (3) the emotional and physical danger to the child
now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the plans for
the child by these individuals; (6) the stability of the home; (7) the acts or omissions of the parent
which may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse
for the acts or omissions of the parent. See Holley, 544 S.W.2d at 371-72. 
            Karrie Emerson, a subcareworker with Child Protective Services, testified that Jude has
remained in the same foster placement and was healthy at the time of trial. In her opinion,
termination was in child’s best interest. In reaching this conclusion, she considered the severity of
the injuries, the number of injuries, and their duration – over the entire four months of his life. She
considered the failure of the parents and extended family to provide protection. In fact, Jude wasn’t
placed with family because home studies revealed there was an issue with the parents continuing to
have access to Jude. She also considered the child’s age – he is not old enough to tell if someone
has harmed him and he can’t protect himself. Emerson anticipated that Jude would be adopted. 
Although the foster parent has not expressed a desire to adopt, there is a likely candidate. 
            Emerson admitted that Jesse and Jessica both love the child and that Jude has enjoyed the
attention from their visits, but she has seen no bonding. The parents have been appropriate in their
play with him but the child is sometimes standoffish. The parents have also been persistent in their
visits and have paid child support. 
            Della Weaver, a family worker with the Child Protective Services division, testified that the
original permanency plan was permanent placement with a relative. This was not the first plan here
because of Jesse’s admission and Jessica’s inability to provide a safe environment for the child. She
admitted that they had not been court ordered to attend parenting glasses but they had attended a 15-week class. Nevertheless, she believed it was in Jude’s best interest to terminate. She had 
considered the emotional and physical needs of the child. There was domestic violence in the home,
marital disputes had led to several separations, and in her view they were using the baby to meet their
own needs. Jude was caught in the middle.
            Weaver had also looked at the emotional and physical danger to the child now and in the
future. Jessica had said she sees no reason to keep Jude from Jesse and she doesn’t think that he
would harm him. “She’s basically in total denial that – and causes great concern on his physical and
emotional well-being. It puts him right back into danger.” There was also an indication of a lack
of parenting abilities to not prioritize the child’s best needs and safety. Failure to prioritize the
child’s needs is a serious defect in parenting skills. She had watched the police video and listened
as Jesse described how he possibly had caused the injuries. “[E]ven now, there’s an omission on
Mrs. Castaneda’s part of knowing that this was going on and continuing – well, even per the
audiotape from her mother that she had shown her mother the bruises and even put her hand on
bruises to demonstrate that it was a handprint.” Jessica had “disclosed all this information prior to
CPS’ involvement, and by still allowing this person access to this child, that’s an act of omission.” 
Weaver believed that naming the State as permanent managing conservator was better than returning
the child to the parents in the event adoption wasn’t possible. Finally, the jury heard the testimony
of Charlotte Harris, Jude’s guardian ad litem, who also recommended termination. 
            Based upon our review of all of the evidence, we conclude that a reasonable trier of fact
could have formed a firm belief or conviction that termination of the parent-child relationship
between Jude and his parents was in the his best interest. Because the evidence is both legally and
factually sufficient, we overrule Issues Two through Nine. The judgment of the trial court is
affirmed.

August 31, 2004                                                                                                                                              ANN CRAWFORD McCLURE, Justice

Before Panel No. 4
Barajas, C.J., Larsen, and McClure, JJ.