# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-25-00257-CV

**L. P., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 23DFAM340930, THE HONORABLE DALLAS SIMS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant L.P. (Mother) appeals from the trial court's order terminating her parental rights to her children, John and Drew, who were ten and eight years old at trial.[1] Mother challenges the sufficiency of the evidence supporting termination of her parental rights under Subsections (D), (N), and (O), as well as the evidence that termination of her rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions), (N) (constructive abandonment), (O) (failure to comply with court-ordered family service plan), (b)(2) (best interest). Mother also contends that the Department failed to make reasonable efforts to provide her with an appropriate service plan designed to facilitate reunification and argues that her constitutional due process rights were violated. We will affirm the order.

---

[1] We refer to appellant as Mother and to her children by aliases. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

Mother lived in a two-bedroom apartment with John and Drew until late 2021 or early 2022 when she began having trouble managing childcare and work commitments. To maintain her job, she left John and Drew in the care of Mr. and Ms. Lewis, who were her mother's friends and attended the same church when Mother was a child. Mother eventually lost her job and apartment, and the children remained with the Lewises.

In August 2023, the Department received a referral after John told another student at school that Mr. Lewis was hitting him. During the Department's investigation, John revealed that the Lewises forced John and Drew to sleep in a converted back porch separated from the house by a sliding door with no air conditioning or access to a bathroom. The Department uncovered further signs of the Lewises' physical abuse, including a scar on John's neck from Ms. Lewis hitting him, a scratch on John's stomach from Ms. Lewis slamming him against a door, and a scar on John's elbow from Ms. Lewis running his elbow down a wooden wall. John also reported that Ms. Lewis "puts her knee into his neck until he cannot breathe," Mr. Lewis punches him in the stomach, and Mr. Lewis told the children that "he could kill them." Though Drew did not disclose any physical abuse, the Department investigator noted that he "appeared to be fearful to be honest." Based on John's injuries and outcries of abuse, the children's fear of returning to the Lewises' house, and the conditions in which the children were living, the Department conducted an emergency removal. The Department was unable to locate Mother or Father, and Ms. Lewis said she had not heard from Mother in two years. The children were first placed with family; however,

---

[2] The following summary is based on evidence presented during the bench trial.

family members could not meet the children's needs for a long-term placement. At the time of trial, the children were living together in a residential treatment center.

In the Department's original petition, it sought managing conservatorship and did not seek to terminate Mother's rights. The Department established a service plan for Mother in which she was required to demonstrate the ability to meet her children's basic needs and ensure their safety; obtain and maintain employment, and, to that end, maintain a log of job applications she submitted and provide a copy to the caseworker each month; participate in a psychological evaluation and comply with all recommendations; participate in supervised visits with the children; attend and participate in individual counseling; submit to random drug testing on a weekly basis; and provide and maintain a safe, clean, and appropriate home.

In May 2024, the Department amended its petition to seek termination of Mother's parental rights based in part on her failure to comply with this service plan. Specifically, the Department characterized Mother's progress as "bare minimum," noting in its final report to the court before the final hearing that Mother was homeless and had not demonstrated the ability to provide a stable home or maintain employment. The Department also noted that Mother had not submitted to regular drug tests but two drug tests that she did take were positive for marijuana in October 2023 and opioids in November 2024.[3] And the Department noted that Mother was "unsuccessfully discharge[d]" from at least one counselor because she "was not cooperative with the therapist."

The bench trial occurred over three days: December 5, 2024, February 6, 2025, and February 13, 2025. The following witnesses testified: Alexia Moore, the Department's

---

[3] Mother later asserted that the positive opioid test was due to medication she received at the hospital. She also maintained that she no longer uses marijuana.

conservatorship worker since August 2023; Luiza Grajales, the children's therapist at the residential treatment center; Michelle Hamilton, the guardian ad litem; and Mother. Documentary evidence included the pleadings, the Department's removal affidavit, Mother's family service plan, visitation reports from Mother's visits with the children, and the residential treatment center's placement report for each child.

Evidence at trial revealed additional abuse and neglect of the children, including from their time in Mother's care. For example, Grajales, the children's therapist, testified that the children had experienced trauma, "like when they weren't fed," and had "a lot of . . . neglect" when they lived with Mother. Grajales also described a scar on Drew's chest, saying "he got that from Mom" and "remembers [] that abuse every time he gets questioned about it." Grajales also described an outcry of sexual abuse by John against his grandfather, as well as "some kind of sexual abuse with Mom and a boyfriend," but she said she understood that had been investigated.

Mother's family service plan and progress reports were admitted in evidence, and witnesses testified to her progress. Moore, the Department's conservatorship worker, testified that Mother "feels hopeless" with her ability to comply with her service plan. Specifically, Moore testified that Mother has not been "able to provide the Department with a stable home, she doesn't have financial stability, and she's not able to say where she's located at this time, and she's reported homeless." Moore testified that Mother does not want resources for finding housing, despite being asked multiple times, but instead wants to continue to remain on the waiting list for public housing. Moore reported that Mother has not "had any luck" finding stable employment and that she has not provided proof that she has been looking. Moore also testified that Mother was not compliant with her drug testing plan and detailed Mother's two positive drug tests for marijuana and opioids, though she noted that Mother reported the positive opioid test was from

4

hydrocodone given to her at the hospital for pain. But Moore agreed that Mother was in therapy and complied with her psychological evaluation requirement.

The psychological evaluation, which was also admitted in evidence, concluded that "the amount of positive response bias used by [Mother] was very high," which indicated that the evaluation "likely failed to uncover all of [Mother's] problems." It stated that people with such high positive response bias "tend to repeat their problematic behavior because they have difficulty learning from their past problems" and "consciously use positive response bias to mislead others into thinking that they are doing well and have no problems." The evaluation noted that test results "suggests that [Mother's] potential for physical child abuse is so robust that even when she tries to cover it up, the [Child Abuse Potential Inventory] test can detect it." The evaluation concluded that "[i]t is unlikely that [Mother] could function independently as a parent" and, in support of reunification, recommended that Mother complete a protective parenting class, participate in individual therapy, take an aggression control class, complete a relationship class, participate in a support group for women who have suffered domestic violence, and obtain her GED or online high school diploma so she can improve her ability to support herself and her family. There was no evidence in the record that Mother had pursued any of these recommendations besides individual therapy.

Witnesses throughout trial agreed that the children were bonded to and missed Mother. Hamilton, the guardian ad litem, testified that the "kids love their mom," and Drew in particular "appears to be very attached to his mom." Moore agreed that the children have a bond with Mother. And Grajales agreed that the children missed Mother, though she noted that while John "would like to go to a foster home," he "fears for [Drew] going back to Mom, so he wants to protect him" and stay with him, even if that means returning to Mother. Hamilton agreed, stating

5

that John is "back and forth" as to whether he wants to return to Mother but "kind of views himself as [Drew's] guardian angel" and wants to "make sure that [Drew] is protected."

But there was also testimony that contact with Mother had caused the children, particularly John, to regress. For example, Grajales testified that John has "regressed" "since not knowing where he's going to go at this point" and with "the increased phone calls" with Mother. She specified that John has been having "a lot of behavioral issues," including "more fighting with [his] peers" and "trying to steal food in his room." Grajales testified that she believed if John had no contact with Mother, "he would improve a whole lot." And Grajales recalled times when Mother did not call for a scheduled virtual visitation, which she said would "ruin" the children's week. She testified that sometimes, the children do not want to have a call with Mother because they have "a lot of anger" and "a lot of sadness," and that "they can't handle it"—the "mixed emotions." Mother agreed that "it's rare" that the children "want to talk," and visitations with the children were "very emotional sometimes," noting that "it's hard for . . . all of us."

Several witnesses agreed that termination of Mother's rights was in the children's best interest. Grajales and Moore both testified that they had "no doubt" termination and becoming available for adoption was in the children's best interest. Grajales testified that it was not in the children's best interest to return to the same "social situation" with Mother and that the children's best interest would be served by adoption and "whatever it takes to get to that point." Hamilton similarly testified that the children no longer spoke in terms of "going home to live with" Mother, and in her opinion, there is no "reasonable expectation to think they're going to be able to go home in the future." Hamilton continued that it "would endanger their physical and emotional wellbeing to be kept in limbo just hoping that mom will get her act together" and the "benefit of potentially finding them an adoptive placement is worth the risk of terminating the mother's rights."

6

Mother disagreed, saying, "I believe I'm supposed to be in their life. This is not supposed to happen." She continued that "no child should go living without their mother." Mother testified that "I love them more than anything" and "I recall every time we visit any and everything they said to me." But Mother admitted that if the children were returned to her, their "only option" for housing would be a shelter, and she did not currently know of a shelter that would accept them. She testified that "it's a 50/50" whether she had demonstrated the ability to meet the children's basic needs and ensure their safety.

Mother was adamant that she did not know about the physical violence happening in the Lewises' home. She admitted "I am at fault" for leaving the children in the Lewises' care but maintained that she did not "knowingly" put the children in a bad situation, saying that she discovered the physical abuse only when she received a letter in the mail. But Mother agreed that in December 2022, Mr. Lewis pushed her during an altercation, which led to a report of neglectful supervision that the Department investigated and ruled out.[4] However, Mother said that the Lewises "didn't give off the impression that they were [dangerous] until that incident." Mother said that when she "wanted to get the boys from them, they had the police called on me . . . and I was not able to take them back."

At the conclusion of the bench trial, the court terminated Mother's rights under subsections (D), (N), and (O), and she appeals. Father's rights were also terminated, but he has not appealed.

---

[4] Initially, it was reported that when Mr. Lewis pushed Mother, she fell on both children; however, the Department determined in its investigation that Mother did not fall on or injure the children.

## STANDARD OF REVIEW

"To terminate parental rights, the factfinder must find by clear and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies, and (2) termination is in the best interest of the child." *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). "Clear and convincing evidence 'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting Tex. Fam. Code § 101.007). This "higher standard of proof" is required "[b]ecause the termination of parental rights implicates fundamental interests." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014).

An appellate court conducting a legal sufficiency review considers all evidence in the light most favorable to the trial court's finding, as well as any undisputed contrary evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that it was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "Courts 'must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' but courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In a factual sufficiency review, the appellate court considers and weighs disputed evidence contrary to the trial court's findings against the evidence in favor of the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* However, appellate courts "provide due deference to the decisions of the factfinder who, having

full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d at 503.

## DISCUSSION

On appeal, Mother challenges the legal and factual sufficiency of the evidence supporting termination of her parental rights under subsections (D), (N), and (O). Tex. Fam. Code § 161.001(b)(1)(D), (N), (O). Mother also maintains that the Department failed to prove by clear and convincing evidence that termination of her rights was in the children's best interest. *See id.* § 161.001(b)(2). Further, Mother contends that the Department failed to make reasonable efforts to provide her with an appropriate and effective service plan designed to facilitate reunification given her circumstances. And Mother argues that her constitutional due process rights were violated, maintaining that she was effectively penalized for her socioeconomic status.

### A. Sufficient evidence supports the termination of Mother's parental rights under Section 161.001(b)(1)(D).

Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's predicate findings under Subsection (D)—that Mother knowingly placed or knowingly allowed the children to remain in conditions or surrounding that endangered the children's physical or emotional wellbeing. *See id.* § 161.001(b)(1)(D); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging Subsection (D) or (E) finding because of "due process concerns, coupled with the requirement for a meaningful appeal").

Subsection (D) focuses on the child's environment and may serve as a ground for termination when the parent has caused a child to be placed or remain in an endangering

9

environment. Tex. Fam. Code § 161.001(b)(1)(D). That is, Subsection (D) focuses on "the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E)." *In re S.B.*, 597 S.W.3d 571, 583 (Tex. App.—Amarillo 2020, pet. denied) (citing *Doyle v. Texas Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied)). The relevant time frame for evaluating Subsection (D) is before the child's removal because the relevant question is whether the environment itself caused the child's physical or emotional well-being to be endangered. *See In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). "The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry." *Id.*

Here, the evidence was undisputed that Mother had placed and left John and Drew with the Lewises for over a year and a half, where they were subjected to physical abuse and unsuitable living conditions, including having to sleep in a converted porch without air conditioning or access to a bathroom. In support of her argument that insufficient evidence supports termination under Subsection (D), Mother points to her testimony that she was unaware of the children's physical abuse until after their removal and the Department's reports that indicate she had not been in touch with the Lewises for two years. However, a parent does not need to know for certain that the child is in an endangering environment; awareness of "the potential for danger to the child in such environment" is sufficient. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). Mother testified that in December 2022, Mr. Lewis pushed her in front of the children during an altercation and stated that the Lewises "didn't give off the impression that they were [dangerous] until that incident." But the children remained with the Lewises until their removal in August 2023. The trial court could have reasonably formed a firm belief or conviction that by at least December 2022, Mother was aware of the potential danger to

10

the children and disregarded that risk by allowing them to stay with the Lewises. *See Jordan v. Dossey*, 325 S.W.3d 700, 721–22 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient under Subsection (D) based in part on evidence that mother "voluntarily and knowingly" placed and allowed son to remain in sole care of father, whom she knew to be "violent" and "abusive"). And it is undisputed that the children's physical and emotional health was endangered by remaining in the Lewises' care.

Further, the trial court heard evidence that the children experienced physical abuse and neglect, including not having enough food to eat, when living with Mother and made outcries of sexual abuse that they maintain occurred during that time. *See In re J.W.*, 645 S.W.3d at 749 (stating that "suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry").

Our standard of review requires deference to the trial court's reasonable resolution of conflicting evidence. *F.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *1 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) and *In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014)). Based on the evidence in the record, the trial court could have formed a firm belief that Mother knowingly placed John and Drew in conditions or surroundings that endangered their physical or emotional wellbeing. Thus, the evidence is legally and factually sufficient to support the trial court's termination of Mother's parental rights under Subsection (D). Because only one predicate violation under Section 161.001(b)(1) is necessary to support a termination decree, we do not address Mother's issues challenging the sufficiency of the evidence for termination under grounds (N) and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Mother's challenge to the statutory predicate findings for termination is overruled.

11

**B. Sufficient evidence supports the best-interest finding.**

Mother also contends that the Department failed to show by clear and convincing evidence that termination of her parental rights is in the children's best interest. There is "a strong but rebuttable presumption that the best interest of the child is served by keeping him or her with their natural parents." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 525 (Tex. App.—Austin 2019, no pet.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). When reviewing the trial court's best-interest findings, courts consider factors including (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent-child relationship is improper, and (9) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). This list is not exhaustive, nor is one factor controlling. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See id.*

On this record, we conclude that the evidence is sufficient to support the trial court's determination that termination of Mother's parental rights is in the children's best interest. The trial court heard Hamilton's testimony that while Drew is "very attached" to Mother and John

12

wants to stay with Drew, the children no longer spoke in terms of "going home to live with" Mother. Similarly, Grajales testified that the children have "conflicting feelings" about returning to Mother and that increased contact with Mother had caused the children, particularly John, to regress.

Moore, Grajales, and Hamilton all agreed that it was in the children's best interest for Mother's parental rights to be terminated so that the Department could find an adoptive placement for them. Though there was no evidence the Department had found a potential foster home placement for the children following their eventual discharge from the residential treatment center, Hamilton testified that she had a "positive outlook" that the Department could find an adoptive home for the children that would provide them with stability. "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (citing *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.)). While a factfinder cannot terminate a parent's rights "merely because the child might be better off living elsewhere, 'a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered.'" *Id.* (quoting *Robert T.*, 2013 WL 812116, at *12).

The trial court could have properly considered the children's special needs arising from their past abuse and neglect that were being served by their current placement at the residential treatment center. The residential treatment center's report indicated that the children were receiving individual, group, sibling, and equine therapy, as well as regular medical, dental,

13

and vision care. The report noted that both John and Drew attended school on site and excel in academics. While there was no immediate plan for discharge from the residential treatment center due to the children's continued needs, the Department's long-term plan was for the children to be placed in an adoptive foster home that can meet their needs. *See Latham v. Texas Dep't of Fam. & Protective Servs.*, 177 S.W.3d 341, 350 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding legally and factually sufficient evidence supports best-interest finding when child was in residential treatment center due to special needs and caseworker testified that "with continued treatment, [child] could be adopted"). The trial court could have reasonably determined that, particularly when compared to the Department's placement and plans for the children, Mother's inability to secure stable housing and employment or otherwise demonstrate her ability to meet the children's basic needs over the course of this case weighed in favor of a finding that termination is in the children's best interest. *See In re S.B.*, 597 S.W.3d at 587–88 ("The factfinder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations of each party are realistic or weak and ill-defined."); *cf. In re N.L.D.*, 412 S.W.3d 810, 822–24 (Tex. App.—Texarkana 2013, no pet.) (holding evidence that mother improved her life by maintaining employment, acquiring home environment that could accommodate children, and having romantic partner that "is a positive influence on her life" weighed against finding that termination was in child's best interest).

The evidence presented to satisfy the predicate-ground findings—regarding endangerment—is similarly probative that termination is in the children's best interest. *See M.R.*, 2018 WL 1023899, at *3. Further, "[a] factfinder may infer that past conduct endangering a child's well-being may recur in the future if the child is returned to the parent." *Id.* at *4; *accord In re S.B.*, 597 S.W.3d at 583. Thus, the trial court could have concluded that Mother's decision to

14

leave the children with unsafe caretakers or expose the children to abuse and neglect "may recur in the future" if the children were returned to her and would expose the children to emotional and physical danger. *See In re S.B.*, 597 S.W.3d at 583; *M.R.*, 2018 WL 1023899, at *3. The trial court could have similarly concluded that this conduct reflected poorly on Mother's parenting abilities and suggested the existing parent-child relationship was improper. *See id.* And the trial court could have credited the psychological evaluation's conclusions, including Mother's "tend[ency] to repeat [] problematic behavior" and elevated risk for physical child abuse.

The evidence showed that Mother complied with some components of her service plan, like completing the psychological evaluation, participating in visits with the children, and attending individual counseling. But it also demonstrated that Mother had not complied with other requirements, including securing stable housing and employment, providing the Department with proof that she is looking for the same, and taking weekly random drug tests. Even crediting Mother's efforts and her explanations regarding the failed drug tests, the trial court could have reasonably concluded that termination of her rights is in the children's best interest, particularly given that "the paramount consideration in a best-interest determination" is the "child's need for permanence through the establishment of a stable, permanent home." *E. N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *8 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (quoting *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)).

On this record, we conclude that there is sufficient evidence from which the trial court could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. We overrule Mother's challenge to the trial court's best-interest finding.

15

### C. We do not reach Mother's issue based on subsection (O).

Next, Mother contends that the Department failed to make reasonable efforts to provide her with "appropriate and effective services designed to facilitate reunification" with the children and that considered her circumstances, "including poverty and homelessness." Specifically, Mother contends that the Department was required to provide her with "proactive, tailored services addressing the parent's specific barriers, not mere referrals." Mother contends that the Department's efforts fell short of this standard.

This issue appears to be an additional challenge to the sufficiency of the evidence to support the trial court's predicate ground findings. *See* Tex. Fam. Code § 161.001(c)(2) (stating that evidence that "parent is economically disadvantaged" does not constitute evidence to support finding under Subsection (b)), (d) (stating that court may not order termination under Subsection (O) based on parent's failure to comply with specific provision of court order if parent proves by preponderance of evidence that she was unable to comply, made good faith effort to comply, and her failure to comply was not attributable to her fault). But we have concluded that the evidence was sufficient to support termination under Subsection (D) based on evidence that Mother placed the children in an endangering environment, not because she was economically disadvantaged.

Because we have concluded that there is sufficient evidence to support termination under Subsection (D), we do not further address this issue to the extent it would impact our analysis of the evidence supporting termination under Subsections (O) or (N).[5] *See In re A.V.*, 113 S.W.3d at 362. We overrule Mother's third issue.

---

[5] Mother also cites to Texas Family Code Sections 262.201(g-1) and 263.102(b) in support for her contention that the Department must make reasonable efforts to return children to their parents. However, Section 262.201(g-1) concerns temporary orders, which are no longer at issue in this appeal from a final termination order. *See* Tex. Fam. Code § 262.201(g-1). And Section

### D. Mother's due process rights were not violated.

Finally, Mother contends that her constitutional due process rights were violated by the termination of her parental rights based on legally and factually insufficient evidence, which she argues was based on her socioeconomic status. She maintains that the Department's case focused on her homelessness, unemployment, and limited education and work history. And she argues that there was no "clear evidence of statutory misconduct," such that her due process rights were violated by the termination order.

"In parental termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d at 235. This standard entails a "high evidentiary burden at trial," as well as "a heightened standard of review" on appeal, which must be "meaningful." *Id.* In the above analysis, we have concluded that Mother was afforded this process. Because legally and factually sufficient evidence—based on Mother placing the children in an endangering environment and the *Holley* factors described above, not merely Mother's homelessness, unemployment, and limited education and work history—supports termination of her rights to the children, we overrule Mother's fourth issue. *See In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that parent's "lack of a home and income" may be considered in best-interest inquiry).

### CONCLUSION

Having overruled each of Mother's issues on appeal, we affirm the trial court's order of termination.

---

263.102(b) requires a specific notice to the parent to be included in the contents of a service plan. *See id.* § 263.102(b). Here, Mother's signed service plan did include that statement.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   July 3, 2025